Robert MADDEN, Appellant,

v.

The STATE of Texas, Appellee.

No. 69625.

Court of Criminal Appeals of Texas, En Banc.

Sept. 12, 1990.

Rehearing Overruled Nov. 28, 1990.

---

William F. Carter, Madisonville, for appellant.

Latham Boone, Dist. Atty., and David S. Barron, Asst. Dist. Atty., Anderson, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

## OPINION

MILLER, Judge.

Appellant was convicted by a jury of capital murder. V.T.C.A. Penal Code,

§ 19.03(a)(2).[1] The trial judge assessed appellant's punishment at death by lethal injection after the jury returned affirmative answers to the special issues submitted pursuant to Art. 37.071(b)(1) and (2), V.A.C.C.P. Appellant raises seven points of error in this direct appeal. Finding no reversible error in these points, we affirm the conviction.

■ Appellant contends in his first point of error that the trial court erred in overruling his motion for instructed verdict which he made at the conclusion of the State's presentation of evidence in its case-in-chief. In his verbal motion, appellant alleged (1) the evidence was insufficient to support a guilty verdict because it failed to establish guilt beyond a reasonable doubt, and (2) the evidence was insufficient to prove guilt beyond a reasonable doubt as to both counts of the indictment.[2] The trial judge overruled the motion.

■ A challenge to the trial judge's ruling on a motion for an instructed verdict is in actuality a challenge to the sufficiency of the evidence to support the conviction. In reviewing the sufficiency of the evidence, we consider all the evidence, both State and defense, in the light most favorable to the verdict.[3] *Moreno v. State*, 755 S.W.2d 866 (Tex.Cr.App.1988). If the evidence is sufficient to sustain the conviction, then the trial judge did not err in overruling appellant's motion. Since the State's evidence is entirely circumstantial, we proceed to a very detailed review of all the evidence presented during trial.

On September 15, 1985, Herbert Megason and his son Gary went to their weekend home in Leon County. Herbert owned a tract of land on which he had built a small cabin, and he was working on a fence and a barn at the property. Harold Watkins, Herbert's employer, testified Herbert worked in his grocery store on Saturday, September 14, 1985, and was to return to work early the following Tuesday. After Herbert failed to return to work, Watkins became concerned about Herbert's welfare, so Bob Blanton, a friend of Herbert's, drove out to the property Wednesday evening but found "everything in order". When Herbert again failed to show for work on Thursday, September 19th, Watkins notified Jewel Megason, Herbert's ex-

---

1. In a second count, the indictment also charged appellant with capital murder under V.T.C.A. Penal Code, § 19.03(a)(6)(A), but the court's charge at guilt/innocence submitted only count one of the indictment to the jury.

2. As we have indicated in footnote 1, appellant was charged with two counts of capital murder, and he addressed both counts in his motion for instructed verdict. The first count charged him with causing the death of Herbert Megason while in the course of committing or attempting to commit robbery of Herbert Megason, and the second count alleged appellant caused the death of two individuals, Gary Megason and Herbert Megason. We need not determine whether the trial court erred in overruling appellant's motion for instructed verdict as to count two, the unsubmitted count, since no conviction arose therefrom.

3. In *Hafdahl v. State* (Tex.Cr.App. No. 69,646 delivered June 13, 1990) (pending on motion for rehearing on other grounds), slip op. at pp. 7–8, the Court held that the appellant *waived* his right to complain that the trial court erred in overruling his motion for instructed verdict by presenting defensive evidence after the State rested its case-in-chief. In so holding, the Court cited *Kuykendall v. State*, 609 S.W.2d 791 (Tex.

Cr.App.1981), and *Shirley v. State*, 501 S.W.2d 635 (Tex.Cr.App.1973), which the *Kuykendall* opinion solely relied on for this waiver proposition. Our research reveals that *Shirley* was decided on the basis of two prior opinions from this Court, *viz: Bellah v. State*, 415 S.W.2d 418 (Tex.Cr.App.1967), and *Davis v. State*, 440 S.W.2d 291 (Tex.Cr.App.1969), neither of which held that an appellant waives his right to complain of the trial judge's overruling of his motion for instructed verdict by presenting defensive evidence. On the contrary, *Bellah* and *Davis* both stand for the principle that an appellate court is not required to pass on the contention that the evidence was insufficient at the time the State rested its case-in-chief once the appellate court has determined, after considering *all* the evidence presented at trial by both the State and the defendant, the evidence is sufficient to sustain the conviction. Thus, the waiver language in *Hafdahl* is disavowed.

We also note that, even though the evidence may be sufficient at the time the motion for instructed verdict is presented and ruled upon, it does not follow that the evidence will be sufficient to sustain the conviction. In this case, however, appellant called one witness to testify, who had previously testified for the State, but he did not elicit any new facts or exculpatory evidence through this witness.

wife; Pam Megason, their daughter; and John Madden[4], mayor of Marquez, the town near the Megason campsite[5]. Watkins also testified he sold to Herbert a .38 Charter Arms Snubnosed pistol, which he kept at the grocery store while working, and a .22 Magnum Winchester rifle. Germane to this latter testimony, one of Herbert's friends, Gary Blalock, who had been to the campsite with Herbert ten or twelve times to hunt and work, testified Herbert *usually* took a .22 rifle and a .410 shotgun with him to the campsite, but he *always* took the .38 pistol which he kept in a red toolbox.

Two neighboring property owners testified to seeing Herbert's truck[6] in the vicinity of his property on September 15, 1985. Jessie Peyton, whose mobile home is at the first gate[7] off the main road leading to the property, stated he was in his kitchen looking through the window when he saw Herbert drive through the gate at approximately 8:30 a.m. or 8:45 a.m. Peyton had "no doubt" it was Herbert because not only did he recognize the truck, but also he saw Herbert "turn[ ] and look[ ] up the hill towards the house as he usually does." Peyton stated Herbert was driving slowly, as usual, since the road is unpaved, but he could not see whether Gary was in the car with Herbert because the camper on the truck blocked the view. Later in the day, at about 1:00 p.m., Peyton stated he heard the gate being opened again, but he did not recall any other vehicles going through the gate that day.

The other neighbor, Paul Schultz, testified his property is one-quarter mile from Peyton's, between Peyton's and the Megasons'. Schultz was sitting in the door of his house when he saw Herbert's truck go by at about 12:30 p.m. or 1:00 p.m. Schultz saw only one person in the truck whom he could not describe although the individual waved to him. Schultz corroborated Peyton's testimony that Herbert generally drove slowly, and he noted that, in this instance, the driver of the truck "was coming out a little faster than the old man usually come (sic) out". Schultz further stated he saw no other vehicles going in or out of the gate that day.

Jewel Megason and other family members went to the campsite on Friday, September 20th. Jewel met Madden and a deputy sheriff at the campsite. Inside the cabin, which was locked, Jewel found several things "unusual" (an overturned ashtray by the bed, a greasy skillet on the stove, opened windows, and the fact that the steps were not against the building). The party then discovered the bodies of Herbert and Gary in a creek a short distance[8] from the cabin.

Madden testified that the "creek" was a ditch with water running through it, and Herbert's and Gary's bodies were placed in the creek feet to feet, up against a steel barricade which served as a dam. The bodies were covered with brush which Madden stated was "very definitely" an attempt to hide them. The brush consisted mostly of deadwood which had either fallen onto or been placed over the bodies, and there was also one small log with a fairly large root system over the bodies. Leon County Deputy Sheriff Gary Rosier described the logs covering the bodies as "pretty big", with one being a small tree, possibly twelve feet long. Rosier stated "two or three or four" persons moved this log so as to recover the victims' bodies.

4. This witness testified he was not related to, nor did he know, the appellant in this case. For clarity's sake, this witness will be referred to as "Madden", while the appellant, Robert Madden, will be referred to as "appellant".

5. The Megason property with the cabin was consistently referred to as the "campsite" throughout the testimony.

6. Herbert drove a silver and red Chevrolet truck, which had a camper on it, with Texas license plates numbered 633 3DN.

7. There are two gates on the dirt road which must be driven through to reach the Megason property.

8. Testimony as to this distance varied. Jewel stated the creek "wasn't that far" from the cabin while other witnesses gave estimates of the distance as between 100 and 200 yards.

He did not notice any drag marks on the ground, which was dusty and sandy. Madden saw distinct tire tracks from the incoming road to the cabin, but the tire tracks and footprints leading toward the creek had been almost "obliterated" by the cattle which roamed the property. Madden therefore could not definitely say whether any of the tire tracks actually *led* to the creek or how recently any of the tracks had been made.

Prior to his testimony concerning the covering of the bodies, Rosier testified that after learning on September 19, 1985, that Herbert and Gary were missing, he went to the campsite that evening. Rosier stated the area was well-organized and neat, with no vehicles present, and he saw nothing in the gully when he walked by. Rosier of course returned to the property the next day to meet Jewel Megason and the others. In the cabin, he discovered blood splatters under a cot, which tested positive for human blood, on paper sacks, and on the doorjamb. Rosier also found a bullet projectile on the floor underneath the cot, which had a corresponding hole in it, and another bullet projectile embedded in a mattress leaning against the wall of the cabin.

Rosier also investigated, on October 3, 1985, an abandoned car found approximately one mile north of where the Megasons' bodies were found. The car, a green 1980 Honda Civic station wagon, license plate number VAP 772, had a flat tire, and the gas gauge indicated empty. No fingerprints were found on the Honda. James Hoyle, Service Manager for Commercial Printing Co. in Killeen, identified this station wagon as the one driven by appellant when making deliveries for the company. Appellant had worked for the company for approximately three weeks, until September 12, 1985, when he failed to show for work. Hoyle also testified that he discovered on September 12th that the delivery vehicle was missing, and he stated that only he and appellant had driven the car the previous day. Although other employees had access to the keys to the Honda, they all returned to work on September 12th. Appellant's grandfather, C.P. Streit, testified that in early October his daughter, appellant's mother, told him appellant had called her and said he left this car "at the deer lease." Many years ago, appellant and Streit had hunted at a lease which was located in the general vicinity of the Megason property.

Texas Ranger Bob Connell also investigated the scene with Rosier and Sheriff Royce Wilson on September 21, 1985. He was unable to obtain any good fingerprints from the cabin because of the extremely dusty conditions in and around the cabin, but he did question a man named Jerry Baker whom Herbert had had an altercation with in the past.[9] Connell also questioned two other men, brothers Paul and Randy Timmerman, who had been at the cabin approximately one year prior to this incident. According to Connell, all three men gave satisfactory explanations regarding their whereabouts on September 15th, and no fingerprints or blood samples were taken from any of the men.

Madden also testified to the condition of the victims' bodies when they were recovered from the creek. Gary's hands had been tied behind his back, and, with a second rope, his right ankle was doubled up behind him and tied to his hands, otherwise described as being "hogtied". His throat had been severed, and he had a large wound to his right shoulder. As to Herbert, Madden stated only that his hands were not tied together but his feet were loosely tied with bailing wire. The zippers were down on both of the men's pants. Sheriff Wilson testified that no personal property, i.e. wallets, car keys, money, watches, or rings, were found on the bodies.

Doctor Eduardo Bellas, Assistant Medical Examiner for Harris County, performed the autopsies on both Gary and Herbert on September 21, 1985. The immediate cause

---

**9.** Jewel testified Pam had dated Baker three or four years ago (prior to this trial), and he had been to the Megasons' lease.

of death for Gary was the cut to his throat which was a deep and gaping wound. Gary also suffered "multiple bird shots, or a distant type shotgun wound" to his back, from which the pellets penetrated his chest and lungs and also led to his death. Gary had defensive wounds from a knife to his hands and forearms, a large stab wound to his right shoulder, and also perforating gunshot wounds to his right hand and left forearm. Herbert, on the other hand, had not been stabbed or cut with a knife, but rather suffered two gunshot wounds to his chest, "both coming front to back, one of them through and through." Bellas estimated both Gary and Herbert had been dead four or five days but added there could be a one and a half to two day difference in the time of death. Moreover, Bellas recovered one bullet from Herbert's body which appeared to be from a .22 caliber weapon. Bellas concluded at least three weapons were used in the commission of the Megasons' murders, namely a knife, a shotgun, and a .22 caliber pistol or rifle.

James Waltmon, a homicide detective in Houston, owned property west of Herbert's. Waltmon testified he was at his property September 11th through the 13th in 1985, at which time he left in his cabin a .22 Frontier Scout Colt revolver and a holster and belt which held .22 bullets. Waltmon also kept at his cabin .22 magnum bullets with copper jackets, but he could not recall whether he had left any of these bullets in the belt. Waltmon returned to his cabin on September 25th only to discover the front door had been pried open and the revolver, the holster and belt, and the bullets had been stolen. No fingerprints were lifted off the cabin door.

Allen Wilson testified he purchased a .410 shotgun on September 19, 1985, at a KOA campground in Amarillo from a person who looked similar to appellant. He further established, by looking at the State's exhibits, that this person was driving Herbert's truck. This person told Wilson he was going hunting in New Mexico and needed cash. Wilson saw two pistols,

a .38 and a .22, which looked like Herbert's and Waltmon's guns respectively, in the camper of the truck. He also saw a shotgun or rifle behind the front seat. Garland Key, Wilson's employee who was traveling with him, positively identified appellant as the man who sold Wilson the shotgun, although he admitted appellant looked differently at trial than he did at the campground. Key spent approximately two hours with appellant, who told him his name was Rob or Robbie, while washing clothes. Key recalled seeing a machete knife in the truck, which he also stated looked like Herbert's truck.

While preparing for Herbert's funeral, Jewel found Herbert's credit cards and a list of the guns he owned. A list of the credit cards was given to the sheriff, and the cards, of which there was a duplicate of Herbert's Texaco gas card, were destroyed by Pam Megason. On September 30, 1985, authorities learned someone was using Herbert's Texaco credit card in New Mexico. At trial, the State introduced into evidence eight copies of credit card invoices billed to Herbert's account. All eight transactions were in New Mexico beginning on September 21, 1985.[10] Although the card was issued to "Herbert E. Megason", each invoice is signed "Robert Madden", and the license plate number thereon is 633 3DN, with all but two invoices indicating the vehicle had Texas plates. Gerald Webb, a documents examiner for the Texas Department of Public Safety, testified he compared the signature on these invoices with a handwriting exemplar from appellant, and, in his opinion, it was appellant who signed the credit card invoices.

Donald Jeffries testified he met appellant, whom he knew as "Jack", at an Exxon station in Eagle Nest, New Mexico. At the time, appellant was driving a silver and maroon truck, which Jeffries identified from exhibits as Herbert's. Appellant wanted to trade a .38 pistol for some "dope", but Jeffries agreed to buy that pistol and another instead. His testimony

---

**10.** The actual dates on the credit card invoices are: September 21, 23, 25 (two invoices), 26, 27, 28, and 31.

established that he eventually purchased Herbert's .38 Charter Arms pistol, Waltmon's .22 magnum pistol and holster, and Herbert's .22 magnum Winchester rifle. As part of the purchase deal, appellant also gave Jeffries a slightly bloodstained knife, a backpack, red toolbox, and bag of shells. Jeffries allowed appellant to stay at his home for several days, and during that stay, appellant admitted to having stolen the truck.[11] Jeffries ordered appellant to remove the truck from his house and suggested he "carry it to Santa Fe and park it at the airport or a shopping center", which he did. Jeffries also took appellant's driver's license "for protection" until he could verify that the guns he had purchased were not stolen, as appellant had sworn to him. Jeffries later learned an arrest warrant had been issued for appellant, and, thus, he contacted William Osterman, the Deputy Sheriff of Colfax County, New Mexico.

Osterman testified he met Jeffries at the city dump in Eagle Nest, New Mexico, on October 7, 1985, at which time, Jeffries gave him appellant's driver's license and the .22 revolver and holster. Osterman and Jeffries met approximately three more times, and over the course of those meetings Osterman received the .22 Winchester rifle with scope and its case, the .38 Charter Arms revolver, the knife and its scabbard, appellant's jacket, a red toolbox, and a bag of shells. Inside a pocket of appellant's jacket was the key to Herbert's truck which was found at a Santa Fe shopping center. Appellant was arrested that same day at a condominium project in Angel Fire, New Mexico.

The weapons and bullets recovered in this case were submitted to the Scientific Crime Laboratory of the Texas Department of Public Safety for testing. Ronald Richardson, supervisor of the firearms section, testified he performed the firearms identification in this case. Using bullets from the cartridge belt, Richardson tested the .410 shotgun, .22 pistol, and .38 pistol, and then compared the resulting bullets with the two projectiles found in the Megasons' cabin and the one taken from Herbert's body during the autopsy. In Richardson's opinion, these latter three bullets were fired from the .22 magnum pistol (which had been stolen from Waltmon). Partially because of the nature of the bullets in this case, that being the copper jacket, Richardson was able to determine that this pistol, exclusive of all others, was the weapon from which these bullets were fired.

 The evidence presented by the State in this case is purely circumstantial. Our standard of review on sufficiency of the evidence, however, does not change with the nature of the evidence; i.e., whether the evidence of guilt is direct or circumstantial, after viewing the evidence in the light most favorable to the prosecution, we determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Butler v. State*, 769 S.W.2d 234 (Tex.Cr.App.1989). Though, when reviewing the sufficiency of circumstantial evidence, we ordinarily utilize the outstanding reasonable hypothesis theory as an analytical tool. *Butler*, 769 S.W.2d at 238, n. 1; *Carlsen v. State*, 654 S.W.2d 444 (Tex. Cr.App.1983) (On State's Motion for Rehearing). Using this tool, we look to see if the evidence supports a reasonable hypothesis other than appellant's guilt.

Appellant contends in his brief that the evidence raises the reasonable hypothesis that other persons committed this crime, and specifically, appellant contends the following facts support his reasonable hypothesis that another or others committed this offense:

1. there's no evidence of his fingerprints at either Waltmon's cabin or the Megason's (sic) cabin, and the only evidence placing him at the scene was the abandoned Honda Civic station wagon;

---

11. Appellant told Jeffries he had stolen his drug counselor's car but that the car had either broken down or run out of gas (Jeffries could not recall), so he walked to a camp house and found the silver and maroon truck with the keys in it.

Appellant told him he took the truck and drove to Raton, New Mexico. Other testimony established that appellant's drug counselor was also the man who owned the print shop where appellant had been employed.

2. Schultz was unable to identify the driver of Herbert's truck as it was leaving the property through the first gate;

3. the Megason home was located in a high crime area [12];

4. Herbert was shot in the cabin which was approximately 200 yards from the creek where his body was found, and there were no drag marks leading to the creek;

5. it took two to four men to move the logs concealing the bodies in the creek;

6. three different weapons were used in commission of the offense, and Herbert and Gary were killed by different weapons;

7. Gary had defensive wounds and was shot in the back;

8. appellant told Jeffries he found the keys in the truck and took the truck.

Appellant submits that none of the evidence presented is consistent with one person committing this offense. He argues that one person could not kill two different people with three different weapons or carry the bodies from the cabin to the creek. He contends that his hypothesis is also supported by the fact that he signed his own name to the credit card invoices, that he admitted he found the keys in the truck, and that his physical appearance and clothing did not indicate he had been in a struggle.[13]

In additional support of his argument, appellant cites *Flores v. State*, 551 S.W.2d 364 (Tex.Cr.App.1977), as authority that the evidence is insufficient to support his guilt. Appellant relies on the principle in *Flores*, 551 S.W.2d at 369, that an accused's recent unexplained possession of a victim's stolen property is not sufficient evidence by itself to sustain a conviction for murder. In *Flores*, the defendant had possession of the deceased's car, as well as other items of his personal property, approximately 24 hours after the deceased

was last seen alive, and several weeks later the defendant was still in possession of the car but it then bore license plates and inspection stickers issued to other cars. There was no evidence, however, that the defendant was at or near the scene of the crime and no showing as to the time of the victim's death. Notably, the murder weapon was never found. This Court held the evidence did not exclude to a moral certainty every other reasonable hypothesis except the defendant's guilt, but instead, only raised a "strong suspicion" or "mere probability" that the defendant either acting alone or with others committed the alleged murder.[14] *Id.* See also *Nathan v. State*, 611 S.W.2d 69 (Tex.Cr.App.1981) (evidence insufficient even though defendant was last person seen with deceased and human blood was found in his car; murder weapon never found and time of death never established); and *Skelton v. State*, 795 S.W.2d 162 (Tex.Cr.App.1989) (murder in course of arson conviction reversed where no showing dynamite obtained by defendant was that used in explosion and no evidence connecting defendant to setting of bomb).

The State responds that the following facts circumstantially connect appellant to the crime. The Honda he was driving was abandoned on either September 11th or 12th just one mile north of where the bodies were found. Appellant sold Herbert's .410 shotgun to Key on September 19th, and he also sold Herbert's .38 pistol and .22 rifle and Waltmon's .22 pistol to Jeffries. Waltmon's .22 pistol, which was stolen from his cabin sometime between September 14th and 25th, was established as the murder weapon as to Herbert. Appellant admitted stealing Herbert's truck, was driving the truck in Amarillo on September 19th, and used Herbert's credit

---

**12.** The Megasons' cabin had been previously burglarized in 1983, and Waltmon testified the area was susceptible to burglaries.

**13.** This last averment is completely unsupported by the evidence. At the time of appellant's arrest, he had been living with Jeffries at his home for about four days, and Key testified he

met appellant at the KOA campground while they were both doing their laundry.

**14.** See now *Butler,* 769 S.W.2d 234, and *Carlsen,* 654 S.W.2d 444, for the present appellate standard of review.

card from September 23rd to the 30th.[15] The State also relies on the legal principle that every fact need not directly and independently prove the defendant's guilt; it is enough if that conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Sullivan v. State,* 564 S.W.2d 698 (Tex.Cr.App.1978) (Opinion on State's Motion for Rehearing).

After reviewing all the evidence presented in this case, we hold the evidence is sufficient to sustain appellant's conviction and the trial court did not err in overruling his motion for an instructed verdict. The evidence, especially appellant's admission to Jeffries that he stole Herbert's truck, clearly places appellant in the crime scene area at the approximate time of the Megasons' murders. Perhaps most damaging is the evidence that appellant was in possession of the .22 caliber murder weapon, which he eventually sold to Jeffries who gave it to the police. Moreover, the time of Herbert's death was established in this case and was consistent with the time appellant was known to be in the area of the Megason campsite. These factors clearly distinguish this case from *Flores,* 551 S.W.2d 364, *Nathan,* 611 S.W.2d 69, and *Skelton,* not yet reported. The State argues in its brief that the only hypothesis other than appellant's guilt is that his car had a flat tire, and he walked through the woods to the Megason campsite; that the Megasons' weapons and the Texaco credit card were in the truck; and that the murderer placed the .22 caliber murder weapon of Waltmon's inside the truck and abandoned it. We agree with the State that this hypothesis is not a reasonable one. Appellant's first point of error is overruled.

■ In his seventh point of error, raised by supplemental brief, appellant contends the evidence was insufficient to warrant an affirmative finding on the second special issue[16] submitted to the jury at the punishment stage. During the punishment phase of trial, the State reoffered the evidence from the guilt/innocence stage. Additionally, appellant and the State stipulated to the facts contained in a pen packet which was introduced into evidence. The pen packet showed appellant was convicted in 1982 for possession of methamphetamine and placed on five years deferred adjudication probation which was revoked in 1983 upon appellant's commission of burglary of a vehicle, and he was assessed a two year sentence in the Texas Department of Corrections. The prosecution concluded its presentation of punishment evidence with testimony from Montgomery County Deputy Sheriff Ricky Staggs regarding an extraneous bad act. Approximately six months prior to this capital murder offense, Staggs responded to a call concerning a burglary of a motor vehicle. When Staggs attempted to question appellant at the scene, appellant pulled a knife, attempted to cut Staggs, and told Staggs he was "going to cut his fucking head off." Three men were needed to restrain appellant, who appeared to be intoxicated but not from alcohol. As a result of this incident, charges of assault on a police officer, resisting arrest, and carrying a prohibited weapon were filed against appellant and were still pending at the time of this trial. Staggs also testified he had made a previous call to appellant's residence with respect to a family disturbance.

Appellant presented numerous witnesses at punishment. Jim Whitley, a clinical psychologist in Huntsville, testified appellant has an avoidant personality disorder, meaning he has trouble interacting with people and avoids conflict. Whitley also stated appellant has a history of long term drug abuse and an unidentified learning disability. These factors, combined with the personality disorder, caused appellant to experience "diminished capacity", a deterioration or distortion of his ability to function, think, or make logical, rational decisions.

---

**15.** As we noted in footnote 11, one of the credit card invoices reflected the date as "9–31–85". We take judicial notice that "30 days hath September."

**16.** The second issue, submitted pursuant to Art. 37.071(b)(2), instructs the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society".

As a result of his learning disability, appellant was not successful in school and consequently felt like a failure and withdrew from that environment. Whitley also stated appellant's ability to get his needs met for love, warmth, and acceptance was impaired and led to his avoidant personality. A "very common" way of dealing with such "psychic pain" is through substance abuse, and Whitley stated appellant's behavior with regard to Staggs was consistent with that of a substance abuser. Whitley also noted appellant attended Synanon Treatment Facility for his substance abuse problem, but that in the psychology community the Synanon program is viewed with disdain because its treatment is nontraditional and more damaging to patients than their disease since it encourages cult membership. Finally, in Whitley's opinion, persons like appellant with substance abuse and psychological problems are treatable, if treatment is initially done in a controlled environment, and they can be contributing members of society.

William Wilson became friends with appellant through their involvement in a Boy Scout troop. Wilson was scout master of the troop which appellant joined when he was twelve or thirteen years old. Appellant attained the leadership positions of Junior Assistant Scout Master and Senior Patrol Leader while involved with the troop for four or five years. Wilson stated appellant interacted with others and handled responsibilities well, although he had a learning disability which made reading in front of the group and reading comprehension difficult.

Robert Bearden, appellant's employer in Killeen, also testified at the punishment phase regarding appellant's substance abuse problem. Bearden started Christian Farms, an alcohol and drug treatment center, in 1970, and appellant entered the program in March of 1985. According to Bearden, appellant was "doing well" at Christian Farms and subsequently was employed by Bearden at his commercial printing company in August of 1985. Appellant's parents also testified he was making progress at Christian Farms prior to commission of this offense.

From the testimony of appellant's father, William Madden, we learn appellant actually attended three drug treatment centers: Palmer Drug Abuse Program when he was fourteen or fifteen years old, Synanon when he was eighteen years old (as a condition of his probation for possession of methamphetamine), and finally Christian Farms. The Palmer Program initially helped appellant but eventually only taught him where to obtain more drugs. The extraneous incident with Staggs occurred after appellant's release from prison but prior to his entry into Christian Farms. William Madden felt the offense of capital murder was not within his son's nature.

Appellant's mother, Susan Madden, testified appellant's natural father, whom she divorced when appellant was two years old, abused both of them and was a violent person. William Madden adopted appellant when he was five years old. He stated appellant had dyslexia and a motor development problem which landed him in special education classes since fourth grade, although appellant was graduated from high school. Appellant had also been active in his church youth group.

■ Upon this evidence the jury determined there was a probability appellant "would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071(b)(2). In reviewing the sufficiency of the evidence to support this determination, this Court, after reviewing the evidence in the light most favorable to the verdict, decides whether any rational trier of fact could make the affirmative finding beyond a reasonable doubt. *Crane v. State*, 786 S.W.2d 338 (Tex.Cr.App.1990). In making this determination we are guided by other cases from this Court which have addressed this same issue. See *Crane*, 786 S.W.2d 338; *Smith v. State*, 779 S.W.2d 417 (Tex.Cr.App.1989); *Sosa v. State*, 769 S.W.2d 909 (Tex.Cr.App.1989); *Huffman v. State*, 746 S.W.2d 212 (Tex.Cr.App.1988); *Marras v. State*, 741 S.W.2d 395 (Tex.Cr.App.1987); *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr.App.1987); and

*Keeton v. State,* 724 S.W.2d 58 (Tex.Cr. App.1987) (Opinion on Rehearing).

Appellant contends the facts of this case *alone* do not warrant an affirmative finding on special issue two, but we cannot agree with this contention. Appellant not only murdered Herbert Megason in the course of robbing him, but he also brutally murdered Herbert's son Gary. Gary's right foot and both hands were "hog-tied", his throat severed execution style, and his arms had numerous defensive wounds. Both bodies were disposed of in a creek and carefully hidden by brush. Although there was no evidence that the violence against the Megasons was long in contemplation and planning or originally intended by appellant, *compare Huffman,* 746 S.W.2d 212, *with Sosa,* 769 S.W.2d 909, and *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr. App.1979), the facts evidence a crime committed by someone with a total lack of regard for human life. *See Willis v. State,* 785 S.W.2d 378 (Tex.Cr.App.1989) (facts of offense, double murder in intentionally set house fire, sufficient for affirmative answer on special issue two). We conclude, without consideration of the other punishment evidence presented by the State, the extremely violent nature of this offense was sufficient to sustain the jury's affirmative answer to the second punishment issue.

██ Moreover, a prior criminal record and unadjudicated offenses may be probative of appellant's future dangerousness. *Willis,* 785 S.W.2d at 387. The evidence indicates appellant committed this offense during a crime spree lasting approximately three weeks, beginning with the theft of his employer's automobile. Appellant continued on his course of criminal behavior by selling the weapons he had stolen from both Waltmon and Herbert, using Herbert's credit card, and soliciting "dope" from Jeffries. The evidence at punishment also revealed appellant had a history of disregard for the law. Appellant had abused drugs since adolescence, was convicted of possession of methamphetamine, and had attacked and attempted to stab Officer Staggs, an offense for which he had not yet been prosecuted.

Appellant, however, introduced substantial mitigating evidence.[17] He was only twenty-one years old at the time of commission of this offense, and there was the evidence of his substance abuse since he was eleven years old. A clinical psychologist testified regarding appellant's social interaction problems which he has experienced since childhood and which are treatable. There was also evidence appellant had been abused as an infant. In spite of this, appellant successfully participated in a church youth group and boy scouts.

Viewing the evidence from both stages of trial and in light of case law from this Court, we determine that a rational trier of fact could make an affirmative finding on special issue two beyond a reasonable doubt. Thus, the evidence was sufficient to support the jury's affirmative finding. Appellant's seventh point of error is accordingly overruled.

██ In his third point of error, appellant contends the trial court erred in allowing the in-court identification of him by witnesses Allen Wilson and Garland Key because the identification was based upon an impermissibly suggestive procedure and resulted in irreparable misidentification. At trial, both Wilson and Key testified in and out of the presence of the jury that, prior to their testimony that morning, the prosecutor had shown them only two photographs, State's exhibits 27 and 28, which are photos of appellant at the time he was incarcerated in the Leon County jail. Neither Wilson nor Key was shown a photographic lineup or photographs of any other persons. In its brief, the State concedes that the "photo spread" shown to Wilson

---

**17.** In *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Supreme Court recognized that some "mitigating" evidence, while lessening the defendant's blameworthiness, actually makes an affirmative answer more likely on special issue two. In *Penry,* the defendant presented mitigating evidence of his mental retardation and abusive childhood. The Court noted "the evidence concerning his inability to learn from his mistakes by virtue of his mental retardation actually suggests that he will be dangerous in the future."

and Key was impermissibly suggestive. *Hubbard v. State*, 496 S.W.2d 924 (Tex.Cr. App.1973), and *Boyd v. State*, 472 S.W.2d 125 (Tex.Cr.App.1971) (practice of showing single photograph to prosecuting witness condemned). Thus, the only question remaining is whether, under the totality of circumstances, the in-court identification was so tainted "as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The appellant bears a heavy burden in this regard, as he must show by clear and convincing evidence that the witness's in-court identification was so tainted. *Holloway v. State*, 691 S.W.2d 608, 615 (Tex.Cr.App.1984), *cert. denied* 475 U.S. 1105, 106 S.Ct. 1508, 89 L.Ed.2d 908, citing *Jackson v. State*, 628 S.W.2d 446 (Tex.Cr.App.1982) (panel opinion). If the totality of circumstances reveals no substantial likelihood of misidentification despite the suggestive identification procedure, then the identification testimony will be deemed reliable, and therefore admissible, as "reliability is the linchpin in determining the admissibility of identification testimony". *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). See also *Webb v. State*, 760 S.W.2d 263, 269 (Tex.Cr.App.1988), *cert. denied* — U.S. —, 109 S.Ct. 3202, 105 L.Ed.2d 709.

In *Webb*, this Court weighed five factors against the corrupting effect of the suggestive identification procedure in assessing reliability under the totality of circumstances. See *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Those nonexclusive factors include: (1) the witness's opportunity to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the trial confrontation, and (5) the time between the crime and the confrontation.[18]

Key positively identified appellant as the man who sold Wilson the shotgun at the KOA campground.[19] He testified in and out of the jury's presence that he met appellant in a well-lit laundry room at the campground and spent one and one-half to two hours with him. Key initially stated his identification of appellant was not based on either seeing State's exhibits 27 and 28 prior to testifying or his experience with him at the KOA. In an attempt at clarification, the prosecutor further questioned Key who stated his identification was based on the photographs because that was "the first time [he had] seen [the man who sold the shotgun], or seen a person that looks like the man since September." Key also testified he could identify appellant irrespective of the photographs, based solely on his experience at the KOA. On crossexamination Key stated the photographs did not have "a lean on" his identification, and that he recognized appellant by the "cold stare in his eyes", "high cheek bone (sic) and dark bushy eyebrows." Key acknowledged appellant looked somewhat different at trial than he did at the KOA [20] and that State's exhibits 27 and 28 more accurately reflected appellant's appearance when he met him, although Key did not recall appellant having a moustache as he does in the exhibits.

After weighing the facts of this case against the State's identification procedure, we find appellant has failed to show by clear and convincing evidence that the

---

**18.** We do not concern ourselves with "the time of the crime" in this case, but rather the time at which Key met the man who sold Wilson the shotgun. Otherwise, the factors are fully applicable.

**19.** When making this inquiry, we do not consider Wilson's testimony regarding his "identification" of appellant as the man who sold him the gun at the KOA campground. Wilson could not make a positive identification that this man and appellant were one and the same. Wilson testified that appellant bore a "similarity" to the man who sold him the gun, and that the man in State's exhibits 27 and 28 bore a "big resemblance" to the man at the campground, but he could not identify appellant as that person. There being no in-court identification of appellant by Wilson, there is no possibility of an "irreparable misidentification".

**20.** Appellant's hair was now shorter and darker, which Key attributed to the cutting off of the sun bleached portions of his hair.

State's impermissibly suggestive identification procedure led to an irreparable in-court misidentification by Key. Thus, Key's in-court identification was reliable and admissible, and we hold the trial court did not err in allowing it. Appellant's third point of error is overruled.

 In his second point of error, appellant contends the trial court erred in admitting over his objection numerous photographs of the deceased. Specifically, appellant complains of two groups of photographs, State's exhibits 15–17 and State's exhibits 46–54. State's exhibits 15–17 [21] are three color photographs of the deceased which were taken at the Megason campsite after the bodies were found and removed from the creek. State's exhibits 46–54 are color photographs of Gary taken at the time of his autopsy. Appellant argues these photographs (1) are not representative of the victims as of the commission date of this offense, (2) have no probative value because of the material change in the bodies resulting from submersion in the creek for five days and decomposition, and (3) were offered solely to inflame the jurors' minds. The State counters the photographs are admissible under the standards of *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972), and *Knoppa v. State*, 505 S.W.2d 802 (Tex.Cr.App.1974).[22]

In the *Martin* case, this Court established the oft-cited rule for the admissibility of photographs, *viz*:

> ... if a photograph is competent, material and relevant to the issue on trial, it is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, unless it is offered solely to inflame the minds of the jury. If a verbal description of the body and the scene would be admissible, a photograph depicting the same is admissible.

*Martin*, 475 S.W.2d at 267 (footnotes omitted). See also *Knoppa*, 505 S.W.2d 802 (photographs taken at scene and at morgue admissible); *Harris v. State*, 661 S.W.2d 106 (Tex.Cr.App.1983) (autopsy photograph admissible to show injury); *Burdine v. State*, 719 S.W.2d 309 (Tex.Cr.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (factors to determine prejudicial effect of photographs); *Jackson v. State*, 745 S.W.2d 4 (Tex.Cr.App.1988), *cert. denied*, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (photographs of deceased prior to autopsy admissible); and *Gordon v. State*, 784 S.W.2d 410 (Tex.Cr.App.1990) (admissibility of silent motion pictures governed by *Martin*). Appellant recognizes the application of the *Martin* rule to the admissibility of gruesome photographs but contends the particular photographs in his case are distinguishable, and thus inadmissible, because they show the condition of the victims' bodies after a "material change" had occurred, caused by the submersion in water for five days and decomposition.

 The State admits in its brief that the pictures are gruesome, but adds that this offense was gruesome. We readily recognize that few, if any, pictures of murder victims will not be so. Gruesomeness, however, does not make a photograph inadmissible per se, but it is merely one factor in the determination of the photograph's prejudicial effect. *Burdine*, 719 S.W.2d at 316. Moreover, this Court no longer adheres to a separate rule for determining the admissibility of "gruesome" pictures. *Martin*, 475 S.W.2d at 268, overruling *Burns v. State*, 388 S.W.2d 690 (Tex.Cr.App.1965). Also, contrary to appellant's position, depiction of the victims' bodies *at time of death* is not a prerequisite for admissibility of photographs; nor is it fatal

**21.** Exhibit 15 is a picture of Gary's backside showing that he was "hogtied". Exhibit 16 is also a picture of Gary showing the wound to his neck and upper right arm. Exhibit 17 is a frontal view of Herbert showing his unzipped pants.

**22.** This case was tried before the effective date of the Rules of Criminal Evidence. With the advent of these rules, the admissibility of photographs is now governed by Rule 403. Under this rule, photographs are admissible if relevant and their probative value is not substantially outweighed by unfair prejudice, etc. Thus, the precedential value to future trials of the holding in these cases regarding admissibility of photographs is questionable.

to admissibility when photographs depict decomposition of the bodies. *Knoppa*, 505 S.W.2d at 803 (photographs admissible despite presence of decomposition and maggots).

Each photograph in issue depicts one of the deceased at the time his body was discovered, which was approximately five days after the estimated time of death. Exhibits 15–17 depict the manner in which Gary was bound, the knife wounds in Gary's neck and arm, and Herbert's unzipped pants, all facts which had been testified to by witnesses at trial and which were relevant to the manner in which the alleged offense was committed. Relatively little decomposition is apparent in these exhibits. The pathologist testified, as to exhibits 46–54, that these photographs did not accurately depict Gary's body at the time of his death but rather at the time his body was received at the morgue. Each photograph shows a separate wound sustained by Gary along with the extent of his body's decomposition. The photographs show the nature and the extent of his wounds, but there is no mutilation of Gary's body.[23] Cf. *Terry v. State*, 491 S.W.2d 161 (Tex.Cr. App.1973) (post-autopsy photographs inadmissible where body mutilated by surgery). We find these photographs were probative of the circumstances of this offense and aided the jury in understanding the testimony at trial. Thus, their purpose was not "solely to inflame the minds of the jury." *Martin*, 475 S.W.2d 265. We hold the trial court did not abuse its discretion in admitting these two sets of photographs. Appellant's second point of error is overruled.

In the fourth point of error, appellant asserts the trial court erred in failing to define "deliberately" in its charge to the jury at punishment. Citing *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977), appellant admits this Court has held that the term "deliberately", as used in Art. 37.-071(b)(1), need not be defined in the jury instructions. He contends, however, that Art. 37.071(b)(1) as written and interpreted deprives him of a fair trial because it lessens the State's burden of proof. Specifically, appellant argues that once the State has proved he committed the act "intentionally", it has no burden to prove he committed the act "deliberately" because the words have the same meaning in the minds of the jurors.

This Court has previously held that the terms "deliberately" and "intentionally" have different meanings for purposes of our capital murder sentencing scheme, see *Tucker v. State*, 771 S.W.2d 523 (Tex.Cr. App.1988), and that, because "deliberately" is not defined by statute, the term is to be understood in light of common usage, and the trial judge need not define it in the jury charge at punishment. *Purtell v. State*, 761 S.W.2d 360 (Tex.Cr.App.1988), *cert. denied*, 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441. Accordingly, the fourth point of error is overruled.

In his fifth point of error, appellant asserts the trial court erred in admitting hearsay evidence over his timely objection. The trial court admitted State's exhibit 8 which is a handwritten list of Herbert's weapons and the corresponding serial numbers which his ex-wife, Jewel Megason, found after his murder in a box among some of Herbert's "personal papers". The State used this exhibit to show that the serial numbers on the weapons sold by appellant to Jeffries and Wilson matched the serial numbers on the list, thus placing appellant in possession of Herbert's property. The State argues the exhibit is not hearsay because it was offered to circumstantially prove Herbert owned these weapons and not for the truth of the matter asserted; or in the alternative, if the exhibit is hearsay, exception 803(15) in the Texas Rules of Criminal Evidence is applicable.[24]

---

**23.** In exhibit 47, the tip of a pair of scissors is inserted through Gary's breast to indicate the path traveled by a bullet. Gary's body, however, had not otherwise been altered by the autopsy at this point.

**24.** The State acknowledges in its brief that these rules of evidence were not effective at the time of appellant's trial but argues the logic of the rule is persuasive and that the exhibit falls squarely within the rule.

We agree with appellant that exhibit 8 is hearsay. The written list was made by Herbert at some time prior to his death[25], and thus was an out-of-court statement. The State, contrary to its position, offered the exhibit for the truth of the matter stated therein, *viz*, that the listed weapons and serial numbers reflect the guns owned by Herbert. Ray, 1A, Texas Practice, Law of Evidence, § 781 (3d ed. 1980). We find, however, that this evidence was admissible as an exception to the hearsay rule. As we have indicated, this trial was held prior to the effective date of the Texas Rules of Criminal Evidence, but pursuant to Art. 38.02, V.A.C.C.P. (repealed), the rules of civil evidence were applicable in criminal cases unless they conflicted with the Code of Criminal Procedure or the Penal Code. *Schaffer v. State*, 777 S.W.2d 111, 113, fn. 1 (Tex.Cr.App.1989). Thus, we turn to the rules of civil evidence.

Texas Rule of Civil Evidence 803(15), effective in 1983, adopted the federal version of this evidence rule, and thus, we look to both rules in determining the list of weapons and serial numbers is admissible. Federal Rule of Evidence 803(15) and Texas Rule of Civil Evidence 803(15) state:

> **Statements in Documents Affecting an Interest in Property.** A statement contained in a document purporting to establish or affect an interest in property if the matter stated was relevant to the purpose of the document, unless dealings with the property since the document was made have been inconsistent with the truth of the statement or the purport of the document.[26]

The advisory committee's note accompanying the federal rule explains the rationale for this rule. The note states that "[d]ispositive documents often contain recitals of fact ... [and the] circumstances under which dispositive documents are executed and the requirement that the recital be germane to the purpose of the document are believed to be *adequate guarantees of trustworthiness ...*" One federal court stated that recitals contained in documents affecting interests in property are admissible as proof of the matters asserted and are strong evidence concerning such matters. *Compton v. Davis Oil Co.*, 607 F.Supp. 1221, 1228 (D.C.Wyo.1985). This hearsay exception is based upon the reliability of such documents. *Id.* at 1229. In *Compton v. WWV Enterprises*, 679 S.W.2d 668, 671 (Tex.App.—Eastland 1984) no writ, the court of appeals construed Texas Rule 803(15) to relate to recitals or statements made in "deeds, leases, mortgages, *and other such 'documents affecting an interest in property' *". (Emphasis supplied). Additionally, this Court has expressed that an exception to the hearsay rule should be liberally construed, but not mechanistically applied. *Coulter v. State*, 494 S.W.2d 876, 883 (Tex.Cr.App.1973) (interpreting business records exception).

With this in mind, we conclude exhibit 8 was admissible as a statement affecting an interest in property, although it was not a legally executed document such as a mortgage. First, the document is a list of the weapons which Herbert owned and their corresponding serial numbers, thus indicating his interest in the property. Secondly, the document bears more than an adequate indicia of reliability. Jewel authenticated the document by testifying that the list was definitely in Herbert's handwriting and that the list was among his personal papers. It is reasonable to assume, although there was no such testimony, that Herbert made this list for his own protection, i.e. insurance purposes, in case of theft or loss of one or all of the weapons, and the recitals therein are "germane to the purpose of the document". We hold the trial court did not abuse its discretion in admitting State's exhibit 8.[27] The fifth point of error is overruled.

---

**25.** Jewel testified that the writing in exhibit 8 was definitely Herbert's printing, but she did not know when Herbert had made this list.

**26.** Texas Rule of Criminal Evidence 803(15) follows these rules verbatim.

**27.** Also compelling in reaching this conclusion were the surrounding hearsay exceptions which deal with evidence of a personal nature. These exceptions include: Rule 803(12) Marriage, Baptismal, and Similar Certificates; Rule 803(13) Family Records; and Rule 803(14) Records of Documents Affecting an Interest in Property.

In his sixth point of error, appellant contends the trial court erred in overruling his objection to the prosecutor's jury argument at the guilt/innocence phase of trial. Appellant claims the prosecutor commented on his failure to testify in violation of Art. 38.08, V.A.C.C.P., Art. I, § 10, Tex. Const., and the Fifth Amendment to the United States Constitution. This Court has had ample opportunity to write on what type jury argument constitutes an improper comment on the defendant's failure to testify. *See e.g. Koller v. State,* 518 S.W.2d 373 (Tex.Cr.App.1975); *Franks v. State,* 574 S.W.2d 124 (Tex.Cr.App.1978); *Myers v. State,* 573 S.W.2d 19 (Tex.Cr.App. 1978); *Angel v. State,* 627 S.W.2d 424 (Tex. Cr.App.1982); *Jackson,* 745 S.W.2d 4; and *Bower v. State,* 769 S.W.2d 887 (Tex.Cr. App.1989), cert. denied, —— U.S. ——, 109 S.Ct. 3266, 106 L.Ed.2d 611. In *Montoya v. State,* 744 S.W.2d 15 (Tex.Cr.App.1987), cert. denied, 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 921, Judge Duncan, writing for the majority on appellant's motion for rehearing, adequately summarized the law in this area, stating:

In order to violate the right against self-incrimination and therefore Article 38.08, *supra,* the offensive language, when viewed from the jury's standpoint, must be manifestly intended or be of such a character that the jury would necessarily and naturally take it as a comment on the accused's failure to testify. It is not sufficient that the language might be construed as an implied or indirect allusion to the defendant's failure to testify. In applying this standard, the facts and circumstances of each case must be analyzed to determine whether the language used was of such character. If the remark called the jury's attention to the absence of evidence that only the testimony from the appellant could supply the conviction is subject to being reversed.

*Id.,* at 35 (citations omitted). In *Montoya,* the prosecutor, while gesturing towards the defendant, asked in part "what do we hear from this man over here" in regard to the punishment issues. Examining the prosecutor's remarks from the jury's standpoint, this Court found the remark was a direct comment on the defendant's failure to testify, but also found beyond a reasonable doubt that the prosecutor's comment did not contribute to the jury's answers on the punishment issues under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Appellant cites *Lee v. State,* 628 S.W.2d 70 (Tex.Cr.App.1982), reh'g. denied, to support his argument that the prosecutor's comment "was an improper allusion to and a comment on [his] failure to testify." The oral argument in *Lee* was similar to the challenged argument in this cause. In that case, a conviction for possession of a short barreled firearm, the prosecutor argued to the jury "Why he borrowed [the gun], his reason for it, like what is he shooting the gun at, doesn't matter, it is not in the law[; t]he only person that knows the motive or what he was really doing with this gun is that man (the defendant)." *Id.* at 71. This Court concluded the argument was an improper allusion to and a comment on the defendant's failure to testify and reversed the conviction.[28]

The comment in the case *sub judice* arose in the following context, while the prosecutor was summarizing the evidence presented during the trial, to wit:

[Prosecutor]: ... Then, also, the defense will argue that why in the world would someone who killed, murdered two people and stole this credit card sign their own name to the Texaco card? I don't know that; you don't know why. There's only one person here that knows why, and there's only one person here that knows the answer to all of these questions. We don't presume criminals

---

**28.** The *Lee* decision reversed the conviction without performing a harmless error analysis. This Court utilized the harmless error test from *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, in *Cook v. State,* 702 S.W.2d 597 (Tex.Cr.App. 1984) (Opinion on State's Motion for Rehear-ing), and found the analysis appropriate for use in *Montoya,* 744 S.W.2d at 38, as well. Thus, this Court has implicitly rejected the notion that the violation of Art. 38.08, V.A.C.C.P. or a defendant's self-incrimination rights constitutes automatic reversible error.

are intelligent, and there's know (sic) evidence before you of this man's intelligence.

[Defense Counsel]: Your Honor, I'm going to object to that as being—going around his right not to have to testify in a criminal case.

THE COURT: Overruled.

After the trial court overruled defense counsel's objection, the prosecutor continued his argument in the following vein:

I don't know why he did it (signed the credit card receipts). Maybe he wanted to be caught. Who knows what goes on in the mind of someone who has brutally murdered two people? I don't know, but that's certainly no reason for you to suspect that he is innocent of this crime. I'm glad he did sign those cards because we might not have ever caught him if he hadn't, and God knows what would have happened down the line.

The State contends the prosecutor's remarks were not a comment on appellant's failure to testify, but rather the prosecutor "merely argued to the jury that the State had no way of knowing, much less proving, why a murderer would sign his own name to the credit card receipts of the victim", and it anticipated defense counsel's argument that appellant signed the receipts because he was innocent and had nothing to hide.[29]

After reviewing the jury arguments in this case, we find the State did accurately anticipate defense counsel's jury argument, but that, however, does not insulate the prosecutor's remarks from constituting a comment on appellant's failure to testify. The prosecutor's argument, that *there is only one person who knows* why appellant signed his own name to the credit card invoices, calls for testimony which only appellant himself could supply. Viewed from the jury's standpoint, the argument was a direct comment on appellant's failure to testify and violates Art. 38.08, and appellant's rights under both the state and federal constitutions. We conclude the trial court erred in overruling appellant's objec-

tion to the prosecutor's argument; however, that conclusion does not necessarily require a reversal of appellant's conviction. We now analyze this error in light of *Chapman v. California* and our own harmless error rule, Tex.R.App.Proc. 81(b)(2). See *Orona v. State*, 791 S.W.2d 125 (Tex.Cr.App.1990) (Rule 81(b)(2) proper standard of review regarding improper jury argument), and *Mallory v. State*, 752 S.W.2d 566 (Tex.Cr.App.1988) (Rule 81(b)(2) is the rhetorical and semantic equivalent of *Chapman v. California* harmless error rule).

In determining whether the error is reversible or harmless, we trace the impact, if any, of the error on the jury. *Harris v. State*, 790 S.W.2d 568 (Tex.Cr.App.1989). This Court examines the error's interaction with the evidence at trial to properly evaluate the impact of the error. *Id.*, at 587. We also consider the arguments of the parties when making this determination with regard to the improper prosecutorial argument.

As we have noted, the State argues it did not improperly comment on appellant's failure to testify but rather anticipated defense counsel's argument that appellant's actions with regard to the credit card were inconsistent with guilt. The quoted portions of the prosecutor's argument in this opinion indicate that he did in fact address this very issue which subsequently was argued by defense counsel. The State also anticipated defense counsel's argument that more than one person murdered the Megasons given the nature of their wounds, the number of weapons used, and the lack of drag marks leading to the creek.

Along with the two arguments anticipated by the State, defense counsel reviewed the jury instructions and specifically explained the interplay between appellant's right not to testify and the State's burden of proof. Defense counsel explained to the jury that appellant's failure to disclose why he used the deceased's truck and credit card could not be used against him and could not even be considered by the jury

---

**29.** The State also argued, in the alternative, that appellant failed to preserve this point of error for review because the trial objection was un-

timely and related only to the comments regarding his intelligence. We find the objection was timely and thus review the merits of this point.

under the trial court's charge because the burden of proof is on the State and that appellant had no burden to meet. Defense counsel then argued the evidence, again referring to the credit card, among other evidence. He asked the jury to consider why a person would commit a brutal murder and then leave a "trail" to himself by taking the deceased's truck and weapons, selling the weapons, using the deceased's credit card, and admitting to have stolen his truck. Counsel also argued that appellant's presence in the area of the Megason property and his possession of the deceased's personalty did not make him guilty of capital murder. In summing up his argument, defense counsel again referred to appellant's use of the credit card, reiterated appellant had nothing to hide, and asked rhetorically why appellant would use his own name and leave a trail to himself if he had committed two brutal murders.

Given the content of the jury arguments and the evidence presented at trial, we conclude beyond a reasonable doubt that the prosecutor's improper comment, which we cannot condone, in his jury argument did not contribute to the jury's guilty verdict. Defense counsel himself emphasized appellant's use of the credit card and asked the jury to consider why a guilty person would lead a trail to himself. Counsel addressed the inconsistencies in appellant's alleged behavior, which could only be explained by appellant himself, and thus indirectly focused the jury on appellant's failure to testify. Under these circumstances, we hold the error in overruling appellant's objection to the prosecutor's improper argument was harmless. Appellant's sixth point of error is therefore overruled.

Finding no merit in appellant's points of error, we accordingly affirm his conviction.

CLINTON and BERCHELMANN, JJ., concur in the result.

W.C. DAVIS, J., not participating.

TEAGUE, J., dissents.