NO. 07-02-0504-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



APRIL 20, 2005



______________________________




TERRY GLENN HONEYCUTT, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 31ST DISTRICT COURT OF GRAY COUNTY;



NO. 6294; HONORABLE STEVEN R. EMMERT, JUDGE



_______________________________



Before QUINN and REAVIS and CAMPBELL, JJ.

OPINION


 Terry Glenn Honeycutt brings this appeal challenging his conviction for the felony
offense of manufacture of a controlled substance and punishment, enhanced by a prior
felony conviction, of seventy-five years confinement in the Institutional Division of the Texas
Department of Criminal Justice. Finding the evidence legally insufficient to sustain the
verdict, we will reverse the trial court's judgment. 

Factual Background

 After being notified by a telephone call from a confidential informant that appellant
could be found at a residence in Pampa, Pampa police officer David Lee and Gray County
deputy sheriff Kelly Rushing approached the residence, seeking to execute an arrest
warrant for parole violations. Based on prior attempts to locate appellant, the officers knew
appellant had lived at that residence with its occupant, Elizabeth Diane Lang. A man
named Mike Marsh answered the door and told Lee appellant was not at the house. 
Through the open door, Lee saw on a coffee table items he considered to be drug
paraphernalia. The items included a small butane torch that was lighted, lithium batteries
and plastic tubing. Advising Marsh that Lang had given him permission to search the
house for appellant at any time, Lee entered and began searching for appellant. Rushing
also entered the house and stayed with Marsh in the living room. After searching the small
house for some time, Lee found appellant hiding behind a suitcase under a bed. 

 Evidence at trial established the officers found a number of other items in the house. 
In the living room, on or near the coffee table, officers found a Dremel tool and bit, a glue
gun, and appellant's wallet containing $487.00. Under a couch cushion, officers found four
small plastic bags containing methamphetamine, together with a small blue bag. (1) Between
the cushions, they found a modified "big mercury [light] bulb." (2) They found what was
described as a "haz mat" suit behind the couch. On a dresser in a bedroom officers found
two syringes also containing methamphetamine, a bag containing pills, more plastic tubing,
a knife, and plastic bags. 

 While there, Rushing called Lang on one of the mobile telephones he found in the
living room. She arrived shortly thereafter and disclaimed ownership of the
methamphetamine and other items. (3) She also told officers neither appellant nor Marsh had
permission to be in the house. She identified a bag containing men's clothing, found in the
bedroom, as belonging to appellant. 

 At trial, Lang also testified she found a small digital scale after the officers left. 
According to her testimony, it belonged to Marsh because he later returned to the house
to retrieve it. 

 The State presented testimony from a Department of Public Safety crime laboratory
supervisor that he found a total of 13.05 grams of material containing methamphetamine
in the syringes and plastic baggies recovered by the officers. With regard to the tablets
found in the bedroom, the court allowed his testimony that "usually tablets like this contain
pseudoephedrine." Another officer testified he was unable to recover any useable
fingerprints from the light bulb. The bulb was the only item he examined for fingerprints. 
The bulb was clean before it was dusted for fingerprints. 

 A Pampa police officer who specializes in drug investigations, Jimmy "Bo" Lake, also
examined the tablets offered by the State and offered his opinion, over objection, that the
tablets appeared to be over the counter medications containing pseudoephedrine. Deputy
Rushing and officer Lake described chemicals and equipment needed to create
methamphetamine. The chemicals included pseudoephedrine, ether or another solvent,
anhydrous ammonia, salt, acid and lithium. Rushing acknowledged that no ether,
anhydrous ammonia, salt, or acid was found. Both officers testified it was not unusual for
the manufacturing process to be undertaken in more than one location, with steps requiring
use of the more dangerous chemicals being performed at a remote site. 

 At the close of the State's evidence, the trial court overruled appellant's motions for
instructed verdict of acquittal. Lang was appellant's only witness. She confirmed appellant
had lived with her until a few weeks before his arrest and that she owned the Dremel tool
and butane torch. She also claimed ownership of the batteries, stating they were for a
smoke detector. Lang said appellant performed automobile body and paint work and used
protective clothing like that found behind the couch. 

 The jury found appellant guilty and assessed punishment, and the court imposed
sentence in accordance with the jury's verdicts. Appellant challenges his conviction in ten
points, assigning error to evidentiary rulings of the trial court, denial of a motion for mistrial
and denial of his motion for instructed verdict of not guilty. We address appellant's points
four and five, in which he challenges the sufficiency of the evidence establishing the
manufacture of methamphetamine. 

Applicable Law

 Issues challenging a trial court's denial of a motion for an instructed verdict actually
challenge the sufficiency of the evidence to support the conviction. Madden v. State, 799
S.W.2d 683, 686 (Tex.Crim.App. 1990), overruled on other grounds, Geesa v. State, 820
S.W.2d 154 (Tex.Crim.App.1991); Coggin v. State, 123 S.W.3d 82, 89 (Tex.App.-Austin
2003, pet. ref'd). 

 In reviewing the legal sufficiency of the evidence, we recognize that the jury is the
sole judge of the weight and credibility of the evidence, and look at all the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed. 2d 560, 573 (1979); Alvarado
v. State, 912 S.W.2d 199, 207 (Tex.Crim.App. 1995); Griffin v. State, 614 S.W.2d 155, 159
(Tex.Crim.App. 1981). The standard for legal sufficiency review "gives full play" to the
jury's responsibility "fairly to resolve conflicts in the testimony, to weigh the evidence, and
to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at
319; Sanders v. State, 119 S.W.3d 818, 820 (Tex.Crim.App. 2003). The standard is the
same in both direct and circumstantial evidence cases. Burden v. State, 55 S.W.3d 608,
612-13 (Tex.Crim.App. 2001). We consider all the evidence that was before the jury,
whether presented by the State or the defense, and whether or not properly admitted. (4)
Johnson v. State, 871 S.W.2d 183, 186 (Tex.Crim.App. 1993); Madden, 799 S.W.2d at
686.

 We measure the elements of the offense as defined by a hypothetically correct jury
charge. Such a charge is one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily increase the State's burden of proof or unnecessarily
restrict the State's theories of liability, and adequately describes the particular offense for
which the defendant was tried. Malik v. State, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997).

 The Controlled Substances Act's definition of "manufacture" includes the production,
preparation, propagation, compounding, conversion or processing of a controlled
substance, and includes the packaging or repackaging of the substance. Tex. Health &
Safety Code Ann. § 481.002(25) (Vernon 2003). "Proof sufficient to show any of the
procedures" listed in the Act's definition of manufacturing is sufficient to support a
conviction of the manufacture of a controlled substance. Fronatt v. State, 630 S.W.2d 703,
704 (Tex.App.-Houston [1st Dist.] 1981, pet ref'd); see Green v. State, 930 S.W.2d 655,
657 (Tex.App.-Fort Worth 1996, pet. ref'd). Analysis

 Consistent with the indictment, the application paragraph of the charge given the jury
required for conviction that they find beyond a reasonable doubt appellant intentionally or
knowingly manufactured between four and two hundred grams of methamphetamine by
means of chemical synthesis. 

 The State's theory at trial was that appellant was engaged in manufacturing of
methamphetamine by the "Nazi cook" method. The method, as officer Lake described it,
involves several steps and begins with pills containing ephedrine or pseudophedrine as raw
material. It also requires an alcohol-based chemical such as denatured alcohol or acetone,
a substance such as lithium, anhydrous ammonia, and a solvent like ether, lighter fluid or
lantern fuel. A later stage of the process, Lake said, requires the production of hydrogen
chloride gas, usually produced by combining rock salt with acid. At points in the process,
heat may be applied to the mixture. Lake testified it is common for the steps of the
manufacturing process to be accomplished at different locations. He also described a
short-cut to the procedure by which the lithium and anhydrous ammonia are combined
directly with the crushed pseudoephedrine pills, apparently obviating the need for the
alcohol-based chemical, and, after those ingredients react, the product is stabilized by
covering it with ether. That mixture may then be transported to another location where the
hydrogen chloride gas can be generated and applied. On cross-examination, Lake
acknowledged it is not possible to manufacture methamphetamine using the method he
described without anhydrous ammonia and an acid. The State also contended the
evidence showed appellant was guilty of manufacturing by packaging. 

 The evidence presented is legally insufficient to show any of the procedures listed
in the Act's definition of manufacturing. The State relies on Fronatt, 630 S.W.2d 703, and
Green, 930 S.W.2d 655. The opinion in Fronatt summarizes the evidence presented in that
case, as follows: "The testimony that [Fronatt] had in his apartment an apparatus capable
of manufacturing methamphetamine, the chemicals necessary to its manufacture, liquid
and powder substances containing methamphetamine, plus the evidence that the
apparatus was operating in [Fronatt's] presence when the officers entered his apartment
is sufficient to prove that [Fronatt] was guilty of the manufacture of methamphetamine." 
The opinion also notes evidence the apparatus emitted a strong smell of ether when
officers entered the apartment. 630 S.W.2d at 704. 

 The evidence produced in Green, an amphetamine case, is comparable. There,
officers saw the defendant standing at a heated stove on which sat a flask containing a
bubbling liquid, a procedure described by testimony as distilling amphetamine. A glass
tube connected to the flask emptied into a mason jar containing amphetamine. A distinct
odor associated with the manufacture of amphetamine was present. The opinion describes
various chemicals and equipment recovered from the premises as "consistent with the
operation of an amphetamine laboratory." 930 S.W.2d at 658. 

 Here, officers found no physical evidence of the occurrence of any stage of the
manufacturing process described by officer Lake. In that significant regard, the evidence
in this case falls far short of that in Fronatt, in which evidence showed an apparatus that
was operating, 630 S.W.2d at 704, and that produced in Green, in which evidence showed
the defendant was found "distilling amphetamine," 930 S.W.2d at 658. See also Goff v.
State, 777 S.W.2d 418 (Tex.Crim.App. 1989) (methamphetamine found suspended in
ether and acetone in "final stages of production"); Gish v. State, 606 S.W.2d 883
(Tex.Crim.App. 1980) (evidence defendant "actively engaged in manufacture and
production" of methamphetamine sufficient); Goforth v. State, 883 S.W.2d 251, 252-53
(Tex.App.-Eastland 1994, no pet.) (flasks containing liquid precursor connected to heaters,
with jars of liquid containing amphetamine in preparatory stage); Brown v. State, 757
S.W.2d 828, 829 (Tex.App.-Waco 1988, pet ref'd) (chemicals in "different stages of the
manufacturing process"). We have here no evidence that "cooking" or similar procedures
were occurring. There is nothing to indicate the burning torch officers found sitting on the
coffee table was being used to apply heat to any chemical mixture, precursor or substance. 
Other than the bag of tablets containing pseudoephedrine, no chemical used in any stage
of the manufacturing process was present. Moreover, there is no physical evidence that
such procedures had occurred. No residue of manufacturing was found. See Brumit v.
State, 42 S.W.3d 201 (Tex.App.-Fort Worth 2001, pet. ref'd) (evidence of empty packages
of ephedrine tablets, residue of tablets left after process and methamphetamine found on
filters and other containers; judgment reversed on absence of evidence of amount). No
testimony indicates the distinctive odor commonly associated with methamphetamine
manufacturing was present. See Lowery v. State, 98 S.W.3d 398, 401 n.2
(Tex.App.-Amarillo 2003, no pet.) (noting courts have recognized that unique odor
emanates from methamphetamine manufacturing). The State argues the Act's definition
of manufacturing does not require for conviction that a defendant be caught while "the cook
is in progress." Here, though, there was no physical evidence of the actual occurrence of
any of the procedures listed in the Act's definition of manufacturing.

 Case law in at least one other state holds that a jury may reasonably infer that
manufacturing occurred where methamphetamine or byproducts of manufacturing are
found in proximity to precursor materials. See State v. McLerran, 122 Wash.App. 1022,
2004 WL 1535642 (Wash. Ct. App. 2004) (unpublished opinion), citing State v. Zunker, 112
Wash.App. 130, 48 P.3d 344, 348 (Wash. Ct. App. 2002), review denied, 148 Wash.2d
1012, 62 P.3d 890 (2003), and State v. McPherson, 111 Wash.App. 747, 757-58, 46 P.3d
284 (Wash. Ct. App. 2002). The cases so holding that we have reviewed, though, all
involve instances in which there was found physical evidence of the occurrence of some
step or stage of the manufacturing process. In McLerran, for instance, the evidence found
by police included coffee filters with sludge containing completed methamphetamine and
its principal byproduct, slip op. at 2, and in Zunker, it included pseudoephedrine pills that
had been ground up in a preparatory step to the process. 48 P.3d at 348. No such
evidence was present here.

 In support of its argument for the sufficiency of the evidence of manufacturing, the
State's brief lists thirteen exhibits (5) which, it argues, support the verdict because the items
are "associated with the manufacture of methamphetamine." It also contends officer Lake
testified each item was "used in the manufacture of methamphetamine." The State argues
the device made from the light bulb is a gas generator used to produce hydrogen chloride
gas to crystallize the methamphetamine. Accepting as true officer Lake's testimony that
the device could be used for that purpose, (6) and drawing the inference that appellant
intended to use it for that purpose, there still is no evidence the device ever had actually
been used for manufacturing. Testimony indicated the item was clean when officers found
it. (7) Further, neither the salt nor the acid necessary to generate the gas was present, nor
was there present any product of earlier stages of the process to which the gas, if
generated, could be applied. Similarly, testimony showed the plastic tubing, the batteries, 
and the "haz mat" suit could play a role in manufacturing methamphetamine, but no
evidence indicated those items had been used in any manufacturing process.

 As noted, testimony showed that the different stages of the manufacturing process
can be, and often are, performed at different locations. But we have no evidence relevant
to manufacturing of events occurring at any location other than the residence at which
appellant was arrested. On this record, any conclusion concerning manufacturing activities
at other locations would be speculation. Even the short-cut method officer Lake described
requires anhydrous ammonia and an acid, in addition to more common items such as rock
salt and various utensils. We have no evidence of the availability of those items. 

 As also noted, the State also argues a theory that appellant engaged in
manufacturing by "packaging or repackaging." (8) It emphasizes deputy Rushing's statement
the methamphetamine powder was "packaged for sale." Under the circumstances
presented here, we cannot agree that the manner in which the methamphetamine powder
was packaged, or the presence of the plastic baggie "corners," provides probative evidence
sufficient to establish beyond a reasonable doubt the identity of the substance's packager. (9) 

 A conclusion of guilt can rest on the combined and cumulative force of all
incriminating circumstances. Conner v. State, 67 S.W.3d 192, 197 (Tex.Crim.App. 2001). 
Of course, assuming that methamphetamine does not occur naturally, the presence of the
substance in both a liquid form contained in syringes and a powder form packaged in
baggies demonstrates it was manufactured by someone, at some time and place. But
without evidence to suggest when (10) or where the methamphetamine present was
manufactured, and without evidence that any step of the manufacturing process had
occurred, too much is missing from the circumstances presented to permit the inference
that appellant is guilty of manufacturing methamphetamine as alleged in the indictment. 

 The State also relies on the tablets identified as pseudoephedrine as evidence that
appellant manufactured methamphetamine. Officer Lake testified pseudoephedrine is a
necessary component in the manufacture of methamphetamine and agreed with the
prosecutor the quantity of tablets in the bag was consistent with a "single cook or a batch
cook." (11) The pseudoephedrine, together with the other items found, support a conclusion
that persons present (12) possessed methamphetamine, and were assembling supplies for
the manufacture of methamphetamine in the future. The possession of methamphetamine
is a violation of the Controlled Substances Act. (13) Tex. Health & Safety Code Ann. §
481.102(6) (Vernon Supp. 2004). The possession or transport, with the intent to unlawfully
manufacture a controlled substance, of certain chemicals and substances also violates the 
Act, § 481.124, as does the possession of drug paraphernalia, § 481.125. Further, by §
481.108 of the Act, Title 4 of the Penal Code (14) is made applicable to offenses under the
Act, permitting the prosecution of attempts and conspiracies to violate its provisions. 
Appellant, though, was tried only for the offense of manufacturing methamphetamine. 
Viewed in the light most favorable to the verdict, the evidence presented at trial would not
permit a rational trier of fact to find beyond a reasonable doubt that appellant manufactured
methamphetamine. We sustain appellant's fourth and fifth points. That holding requires
reversal of the judgment of the trial court and rendition of a judgment of acquittal. Clewis
v. State, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996). This disposition obviates the need
to address appellant's remaining points. 


 James T. Campbell

 Justice




Do not publish.

 


1. The blue bag, closed with a zipper, contained several triangular pieces of plastic,
identified by an officer's testimony as "corner baggies," corners cut from sandwich bags,
commonly used to package drugs.
2. The officers' testimony indicated the filament had been removed from the bulb, the
metal end had been re-attached and a hole had been drilled in the bulb, to which a length
of plastic tubing had been (or perhaps was in the process of being) glued.
3. At trial Lang testified the Dremel tool and torch did belong to her and had been in
the house for some time. 
4. We need not, therefore, first address appellant's points of error challenging
admission of certain evidence.
5. The thirteen items listed are the "haz mat" suit; the lithium batteries; the Dremel tool
bit; the clear baggie containing powder; the blue zipper bag containing "corner baggies"; 
the baggies of methamphetamine; the tubes containing liquid methamphetamine taken from
the syringes; the large plastic bag containing pseudoephedrine tablets; the "HCL gas
generator with tubing"; the butane torch; the glue gun; the cordless drill; and the
hypodermic syringes.
6. The State contends officer Lake testified the bulb was a hydrogen chloride gas
generator. The prosecutor's actual question to officer Lake with regard to the exhibit was,
"Is this thing - could this thing be utilized as a generator?" He answered yes. When officer
Lee was asked if he saw anything at the house that was "consistent with a generator" he
answered: "Well, I guess you could take that glass light bulb . . . where they had converted
it and put a tube in it[.]" Deputy Rushing testified the apparatus could be used as a
generator. Other testimony showed the glass bulb stands up to heat well. Lake testified
a generator is typically a "jug" where salt and acid are combined to generate hydrogen
chloride gas, indicating the process was the result of a chemical reaction rather than heat
applied to the container. 
7. Rushing said it was "bright and shiny" when he first saw it.
8. See Tex.Health & Safety Code ann. § 481.002(25) (Vernon 2003). The parties do
not discuss whether evidence of manufacturing by packaging would be sufficient to convict
under an indictment alleging manufacturing by means of chemical synthesis. See generally
Fuller v. State, 73 S.W.3d 250, 254 (Tex.Crim.App. 2002); Gollihar v. State, 46 S.W.3d
243, 246 (Tex.Crim.App. 2001); Malik v. State, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). 
We express no opinion on that matter.
9. When Deputy Rushing described the methamphetamine as "packaged for sale" on
cross examination, the following exchange took place:


 Q: Okay. Well, how do you distinguish if it is packaged for sale or packaged
to be bought? How do you know if he bought it or is selling it?


 A: Oh, you don't know, unless you see a transaction.


 Q: That is correct. So those three packages would be just as consistent with
somebody like Mike Marsh had them on his person and was going to use
them. Is that correct?


 A: It would be, yes. 
10. The Department of Public Safety chemist who testified to the analysis of the
methamphetamine said he knew of no way to tell when the powdered methamphetamine
found under the couch cushions was made. 
11. The bag was marked with the number 336 and testimony indicated that
manufacturers often mark on a bag the number of tablets it contains. None of the State's
witnesses counted the number of tablets in the bag. Cf. Tex. Health & Safety Code Ann.
§ 481.124(b)(3) (Vernon 2003) (creating presumption of intent to manufacture
methamphetamine from possession of 300 tablets containing pseudoephedrine together
with other specifically named substances).
12. Appellant also contends there is insufficient evidence to establish his knowing
possession of the incriminating items. We do not reach those contentions. 
13. The State has not challenged the trial court's denial of its request for a jury charge
on the offense of possession of a controlled substance. The trial court relied on the holding
in Hardie v. State, 79 S.W.3d 625, 631 (Tex.App.-Waco 2002, pet. ref'd) (holding
possession is not a lesser included offense of manufacturing a controlled substance). 
14. Tex. Pen. Code Ann. § 15.01, et seq. (Vernon 2003).