NO. 07-02-0504-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

APRIL 20, 2005

_____

TERRY GLENN HONEYCUTT, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 31ST DISTRICT COURT OF GRAY COUNTY;

NO. 6294; HONORABLE STEVEN R. EMMERT, JUDGE

_____

Before QUINN and REAVIS and CAMPBELL, JJ.

**OPINION**

Terry Glenn Honeycutt brings this appeal challenging his conviction for the felony offense of manufacture of a controlled substance and punishment, enhanced by a prior felony conviction, of seventy-five years confinement in the Institutional Division of the Texas Department of Criminal Justice. Finding the evidence legally insufficient to sustain the verdict, we will reverse the trial court's judgment.

**Factual Background**

After being notified by a telephone call from a confidential informant that appellant could be found at a residence in Pampa, Pampa police officer David Lee and Gray County deputy sheriff Kelly Rushing approached the residence, seeking to execute an arrest warrant for parole violations. Based on prior attempts to locate appellant, the officers knew appellant had lived at that residence with its occupant, Elizabeth Diane Lang. A man named Mike Marsh answered the door and told Lee appellant was not at the house. Through the open door, Lee saw on a coffee table items he considered to be drug paraphernalia. The items included a small butane torch that was lighted, lithium batteries and plastic tubing. Advising Marsh that Lang had given him permission to search the house for appellant at any time, Lee entered and began searching for appellant. Rushing also entered the house and stayed with Marsh in the living room. After searching the small house for some time, Lee found appellant hiding behind a suitcase under a bed.

Evidence at trial established the officers found a number of other items in the house. In the living room, on or near the coffee table, officers found a Dremel tool and bit, a glue gun, and appellant's wallet containing $487.00. Under a couch cushion, officers found four small plastic bags containing methamphetamine, together with a small blue bag.[1] Between the cushions, they found a modified "big mercury [light] bulb."[2] They found what was

---

[1]The blue bag, closed with a zipper, contained several triangular pieces of plastic, identified by an officer's testimony as "corner baggies," corners cut from sandwich bags, commonly used to package drugs.

[2]The officers' testimony indicated the filament had been removed from the bulb, the metal end had been re-attached and a hole had been drilled in the bulb, to which a length

described as a "haz mat" suit behind the couch. On a dresser in a bedroom officers found two syringes also containing methamphetamine, a bag containing pills, more plastic tubing, a knife, and plastic bags.

While there, Rushing called Lang on one of the mobile telephones he found in the living room. She arrived shortly thereafter and disclaimed ownership of the methamphetamine and other items.[3] She also told officers neither appellant nor Marsh had permission to be in the house. She identified a bag containing men's clothing, found in the bedroom, as belonging to appellant.

At trial, Lang also testified she found a small digital scale after the officers left. According to her testimony, it belonged to Marsh because he later returned to the house to retrieve it.

The State presented testimony from a Department of Public Safety crime laboratory supervisor that he found a total of 13.05 grams of material containing methamphetamine in the syringes and plastic baggies recovered by the officers. With regard to the tablets found in the bedroom, the court allowed his testimony that "usually tablets like this contain pseudoephedrine." Another officer testified he was unable to recover any useable fingerprints from the light bulb. The bulb was the only item he examined for fingerprints. The bulb was clean before it was dusted for fingerprints.

---

of plastic tubing had been (or perhaps was in the process of being) glued.

[3] At trial Lang testified the Dremel tool and torch did belong to her and had been in the house for some time.

A Pampa police officer who specializes in drug investigations, Jimmy "Bo" Lake, also examined the tablets offered by the State and offered his opinion, over objection, that the tablets appeared to be over the counter medications containing pseudoephedrine. Deputy Rushing and officer Lake described chemicals and equipment needed to create methamphetamine. The chemicals included pseudoephedrine, ether or another solvent, anhydrous ammonia, salt, acid and lithium. Rushing acknowledged that no ether, anhydrous ammonia, salt, or acid was found. Both officers testified it was not unusual for the manufacturing process to be undertaken in more than one location, with steps requiring use of the more dangerous chemicals being performed at a remote site.

At the close of the State's evidence, the trial court overruled appellant's motions for instructed verdict of acquittal. Lang was appellant's only witness. She confirmed appellant had lived with her until a few weeks before his arrest and that she owned the Dremel tool and butane torch. She also claimed ownership of the batteries, stating they were for a smoke detector. Lang said appellant performed automobile body and paint work and used protective clothing like that found behind the couch.

The jury found appellant guilty and assessed punishment, and the court imposed sentence in accordance with the jury's verdicts. Appellant challenges his conviction in ten points, assigning error to evidentiary rulings of the trial court, denial of a motion for mistrial and denial of his motion for instructed verdict of not guilty. We address appellant's points four and five, in which he challenges the sufficiency of the evidence establishing the manufacture of methamphetamine.

**Applicable Law**

Issues challenging a trial court's denial of a motion for an instructed verdict actually challenge the sufficiency of the evidence to support the conviction. *Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App. 1990), *overruled on other grounds*, *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991); *Coggin v. State*, 123 S.W.3d 82, 89 (Tex.App.–Austin 2003, pet. ref'd).

In reviewing the legal sufficiency of the evidence, we recognize that the jury is the sole judge of the weight and credibility of the evidence, and look at all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed. 2d 560, 573 (1979); *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex.Crim.App. 1995); *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim.App. 1981). The standard for legal sufficiency review "gives full play" to the jury's responsibility "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *Sanders v. State*, 119 S.W.3d 818, 820 (Tex.Crim.App. 2003). The standard is the same in both direct and circumstantial evidence cases. *Burden v. State*, 55 S.W.3d 608, 612-13 (Tex.Crim.App. 2001). We consider all the evidence that was before the jury, whether presented by the State or the defense, and whether or not properly admitted.[4]

---

[4]We need not, therefore, first address appellant's points of error challenging admission of certain evidence.

*Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App. 1993); *Madden*, 799 S.W.2d at 686.

We measure the elements of the offense as defined by a hypothetically correct jury charge. Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997).

The Controlled Substances Act's definition of "manufacture" includes the production, preparation, propagation, compounding, conversion or processing of a controlled substance, and includes the packaging or repackaging of the substance. Tex. Health & Safety Code Ann. § 481.002(25) (Vernon 2003). "Proof sufficient to show any of the procedures" listed in the Act's definition of manufacturing is sufficient to support a conviction of the manufacture of a controlled substance. *Fronatt v. State*, 630 S.W.2d 703, 704 (Tex.App.–Houston [1st Dist.] 1981, pet ref'd); *see Green v. State*, 930 S.W.2d 655, 657 (Tex.App.–Fort Worth 1996, pet. ref'd).

**Analysis**

Consistent with the indictment, the application paragraph of the charge given the jury required for conviction that they find beyond a reasonable doubt appellant intentionally or knowingly manufactured between four and two hundred grams of methamphetamine by means of chemical synthesis.

-6-

The State's theory at trial was that appellant was engaged in manufacturing of methamphetamine by the "Nazi cook" method. The method, as officer Lake described it, involves several steps and begins with pills containing ephedrine or pseudophedrine as raw material. It also requires an alcohol-based chemical such as denatured alcohol or acetone, a substance such as lithium, anhydrous ammonia, and a solvent like ether, lighter fluid or lantern fuel. A later stage of the process, Lake said, requires the production of hydrogen chloride gas, usually produced by combining rock salt with acid. At points in the process, heat may be applied to the mixture. Lake testified it is common for the steps of the manufacturing process to be accomplished at different locations. He also described a short-cut to the procedure by which the lithium and anhydrous ammonia are combined directly with the crushed pseudoephedrine pills, apparently obviating the need for the alcohol-based chemical, and, after those ingredients react, the product is stabilized by covering it with ether. That mixture may then be transported to another location where the hydrogen chloride gas can be generated and applied. On cross-examination, Lake acknowledged it is not possible to manufacture methamphetamine using the method he described without anhydrous ammonia and an acid. The State also contended the evidence showed appellant was guilty of manufacturing by packaging.

The evidence presented is legally insufficient to show any of the procedures listed in the Act's definition of manufacturing. The State relies on *Fronatt*, 630 S.W.2d 703, and *Green*, 930 S.W.2d 655. The opinion in *Fronatt* summarizes the evidence presented in that case, as follows: "The testimony that [Fronatt] had in his apartment an apparatus capable of manufacturing methamphetamine, the chemicals necessary to its manufacture, liquid

and powder substances containing methamphetamine, plus the evidence that the apparatus was operating in [Fronatt's] presence when the officers entered his apartment is sufficient to prove that [Fronatt] was guilty of the manufacture of methamphetamine." The opinion also notes evidence the apparatus emitted a strong smell of ether when officers entered the apartment. 630 S.W.2d at 704.

The evidence produced in *Green*, an amphetamine case, is comparable. There, officers saw the defendant standing at a heated stove on which sat a flask containing a bubbling liquid, a procedure described by testimony as distilling amphetamine. A glass tube connected to the flask emptied into a mason jar containing amphetamine. A distinct odor associated with the manufacture of amphetamine was present. The opinion describes various chemicals and equipment recovered from the premises as "consistent with the operation of an amphetamine laboratory." 930 S.W.2d at 658.

Here, officers found no physical evidence of the occurrence of any stage of the manufacturing process described by officer Lake. In that significant regard, the evidence in this case falls far short of that in *Fronatt*, in which evidence showed an apparatus that was operating, 630 S.W.2d at 704, and that produced in *Green*, in which evidence showed the defendant was found "distilling amphetamine," 930 S.W.2d at 658. *See also Goff v. State*, 777 S.W.2d 418 (Tex.Crim.App. 1989) (methamphetamine found suspended in ether and acetone in "final stages of production"); *Gish v. State*, 606 S.W.2d 883 (Tex.Crim.App. 1980) (evidence defendant "actively engaged in manufacture and production" of methamphetamine sufficient); *Goforth v. State,* 883 S.W.2d 251, 252-53 (Tex.App.–Eastland 1994, no pet.) (flasks containing liquid precursor connected to heaters,

-8-

with jars of liquid containing amphetamine in preparatory stage); *Brown v. State*, 757 S.W.2d 828, 829 (Tex.App.–Waco 1988, pet ref'd) (chemicals in "different stages of the manufacturing process"). We have here no evidence that "cooking" or similar procedures were occurring. There is nothing to indicate the burning torch officers found sitting on the coffee table was being used to apply heat to any chemical mixture, precursor or substance. Other than the bag of tablets containing pseudoephedrine, no chemical used in any stage of the manufacturing process was present. Moreover, there is no physical evidence that such procedures had occurred. No residue of manufacturing was found. *See Brumit v. State*, 42 S.W.3d 201 (Tex.App.–Fort Worth 2001, pet. ref'd) (evidence of empty packages of ephedrine tablets, residue of tablets left after process and methamphetamine found on filters and other containers; judgment reversed on absence of evidence of amount). No testimony indicates the distinctive odor commonly associated with methamphetamine manufacturing was present. *See Lowery v. State*, 98 S.W.3d 398, 401 n.2 (Tex.App.–Amarillo 2003, no pet.) (noting courts have recognized that unique odor emanates from methamphetamine manufacturing). The State argues the Act's definition of manufacturing does not require for conviction that a defendant be caught while "the cook is in progress." Here, though, there was no physical evidence of the actual occurrence of any of the procedures listed in the Act's definition of manufacturing.

Case law in at least one other state holds that a jury may reasonably infer that manufacturing occurred where methamphetamine or byproducts of manufacturing are found in proximity to precursor materials. *See State v. McLerran*, 122 Wash.App. 1022, 2004 WL 1535642 (Wash. Ct. App. 2004) (unpublished opinion), *citing State v. Zunker*, 112

Wash.App. 130, 48 P.3d 344, 348 (Wash. Ct. App. 2002), *review denied*, 148 Wash.2d 1012, 62 P.3d 890 (2003), and *State v. McPherson*, 111 Wash.App. 747, 757-58, 46 P.3d 284 (Wash. Ct. App. 2002). The cases so holding that we have reviewed, though, all involve instances in which there was found physical evidence of the occurrence of some step or stage of the manufacturing process. In *McLerran*, for instance, the evidence found by police included coffee filters with sludge containing completed methamphetamine and its principal byproduct, slip op. at 2, and in *Zunker*, it included pseudoephedrine pills that had been ground up in a preparatory step to the process. 48 P.3d at 348. No such evidence was present here.

In support of its argument for the sufficiency of the evidence of manufacturing, the State's brief lists thirteen exhibits[5] which, it argues, support the verdict because the items are "associated with the manufacture of methamphetamine." It also contends officer Lake testified each item was "used in the manufacture of methamphetamine." The State argues the device made from the light bulb is a gas generator used to produce hydrogen chloride gas to crystallize the methamphetamine. Accepting as true officer Lake's testimony that the device could be used for that purpose,[6] and drawing the inference that appellant

_____

[5]The thirteen items listed are the "haz mat" suit; the lithium batteries; the Dremel tool bit; the clear baggie containing powder; the blue zipper bag containing "corner baggies"; the baggies of methamphetamine; the tubes containing liquid methamphetamine taken from the syringes; the large plastic bag containing pseudoephedrine tablets; the "HCL gas generator with tubing"; the butane torch; the glue gun; the cordless drill; and the hypodermic syringes.

[6]The State contends officer Lake testified the bulb was a hydrogen chloride gas generator. The prosecutor's actual question to officer Lake with regard to the exhibit was, "Is this thing - could this thing be utilized as a generator?" He answered yes. When officer Lee was asked if he saw anything at the house that was "consistent with a generator" he

-10-

intended to use it for that purpose, there still is no evidence the device ever had actually been used for manufacturing. Testimony indicated the item was clean when officers found it.[7] Further, neither the salt nor the acid necessary to generate the gas was present, nor was there present any product of earlier stages of the process to which the gas, if generated, could be applied. Similarly, testimony showed the plastic tubing, the batteries, and the "haz mat" suit could play a role in manufacturing methamphetamine, but no evidence indicated those items had been used in any manufacturing process.

As noted, testimony showed that the different stages of the manufacturing process can be, and often are, performed at different locations. But we have no evidence relevant to manufacturing of events occurring at any location other than the residence at which appellant was arrested. On this record, any conclusion concerning manufacturing activities at other locations would be speculation. Even the short-cut method officer Lake described requires anhydrous ammonia and an acid, in addition to more common items such as rock salt and various utensils. We have no evidence of the availability of those items.

---

answered: "Well, I guess you could take that glass light bulb . . . where they had converted it and put a tube in it[.]" Deputy Rushing testified the apparatus could be used as a generator. Other testimony showed the glass bulb stands up to heat well. Lake testified a generator is typically a "jug" where salt and acid are combined to generate hydrogen chloride gas, indicating the process was the result of a chemical reaction rather than heat applied to the container.

[7]Rushing said it was "bright and shiny" when he first saw it.

-11-

As also noted, the State also argues a theory that appellant engaged in manufacturing by "packaging or repackaging."[8] It emphasizes deputy Rushing's statement the methamphetamine powder was "packaged for sale." Under the circumstances presented here, we cannot agree that the manner in which the methamphetamine powder was packaged, or the presence of the plastic baggie "corners," provides probative evidence sufficient to establish beyond a reasonable doubt the identity of the substance's packager.[9]

A conclusion of guilt can rest on the combined and cumulative force of all incriminating circumstances. *Conner v. State*, 67 S.W.3d 192, 197 (Tex.Crim.App. 2001). Of course, assuming that methamphetamine does not occur naturally, the presence of the substance in both a liquid form contained in syringes and a powder form packaged in baggies demonstrates it was manufactured by someone, at some time and place. But

_____

[8]*See* Tex.Health & Safety Code ann. § 481.002(25) (Vernon 2003). The parties do not discuss whether evidence of manufacturing by packaging would be sufficient to convict under an indictment alleging manufacturing by means of chemical synthesis. *See generally Fuller v. State,* 73 S.W.3d 250, 254 (Tex.Crim.App. 2002)*; Gollihar v. State,* 46 S.W.3d 243, 246 (Tex.Crim.App. 2001); *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). We express no opinion on that matter.

[9]When Deputy Rushing described the methamphetamine as "packaged for sale" on cross examination, the following exchange took place:

Q: Okay. Well, how do you distinguish if it is packaged for sale or packaged to be bought? How do you know if he bought it or is selling it?

A: Oh, you don't know, unless you see a transaction.

Q: That is correct. So those three packages would be just as consistent with somebody like Mike Marsh had them on his person and was going to use them. Is that correct?

A: It would be, yes.

without evidence to suggest when[10] or where the methamphetamine present was manufactured, and without evidence that any step of the manufacturing process had occurred, too much is missing from the circumstances presented to permit the inference that appellant is guilty of manufacturing methamphetamine as alleged in the indictment.

The State also relies on the tablets identified as pseudoephedrine as evidence that appellant manufactured methamphetamine. Officer Lake testified pseudoephedrine is a necessary component in the manufacture of methamphetamine and agreed with the prosecutor the quantity of tablets in the bag was consistent with a "single cook or a batch cook."[11] The pseudoephedrine, together with the other items found, support a conclusion that persons present[12] possessed methamphetamine, and were assembling supplies for the manufacture of methamphetamine in the future. The possession of methamphetamine is a violation of the Controlled Substances Act.[13] Tex. Health & Safety Code Ann. §

---

[10]The Department of Public Safety chemist who testified to the analysis of the methamphetamine said he knew of no way to tell when the powdered methamphetamine found under the couch cushions was made.

[11]The bag was marked with the number 336 and testimony indicated that manufacturers often mark on a bag the number of tablets it contains. None of the State's witnesses counted the number of tablets in the bag. *Cf.* Tex. Health & Safety Code Ann. § 481.124(b)(3) (Vernon 2003) (creating presumption of intent to manufacture methamphetamine from possession of 300 tablets containing pseudoephedrine together with other specifically named substances).

[12]Appellant also contends there is insufficient evidence to establish his knowing possession of the incriminating items. We do not reach those contentions.

[13] The State has not challenged the trial court's denial of its request for a jury charge on the offense of possession of a controlled substance. The trial court relied on the holding in *Hardie v. State*, 79 S.W.3d 625, 631 (Tex.App.–Waco 2002, pet. ref'd) (holding possession is not a lesser included offense of manufacturing a controlled substance).

-13-

481.102(6) (Vernon Supp. 2004). The possession or transport, with the intent to unlawfully manufacture a controlled substance, of certain chemicals and substances also violates the Act, § 481.124, as does the possession of drug paraphernalia, § 481.125. Further, by § 481.108 of the Act, Title 4 of the Penal Code[14] is made applicable to offenses under the Act, permitting the prosecution of attempts and conspiracies to violate its provisions. Appellant, though, was tried only for the offense of manufacturing methamphetamine. Viewed in the light most favorable to the verdict, the evidence presented at trial would not permit a rational trier of fact to find beyond a reasonable doubt that appellant manufactured methamphetamine. We sustain appellant's fourth and fifth points. That holding requires reversal of the judgment of the trial court and rendition of a judgment of acquittal. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996). This disposition obviates the need to address appellant's remaining points.


James T. Campbell
Justice


Do not publish.

---

[14]Tex. Pen. Code Ann. § 15.01, *et seq*. (Vernon 2003).