TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00757-CR






Robert Salazar, Appellant


v.


The State of Texas, Appellee






FROM COUNTY COURT AT LAW NO. 4 OF TRAVIS COUNTY

NO. C-1-CR-09-501033, HONORABLE MIKE DENTON, JUDGE PRESIDING






M E M O R AN D U M O P I N I O N



 A jury convicted Robert Salazar of the misdemeanor offense of violation of a
protective order, and pursuant to a plea bargain on punishment, the trial court sentenced Salazar to
180 days in jail. In his sole issue on appeal, Salazar contends that the trial court erred in denying his
motion for instructed verdict, alleging that there was a fatal variance between the victim identified
in the charging instrument and the victim identified in the trial evidence. We will affirm the
judgment of conviction.



BACKGROUND


 The jury heard evidence that Salazar's girlfriend, Yolanda Barrera, applied for a
protective order against Salazar, to which Salazar agreed. The two-year protective order, effective
April 3, 2009, prohibited Salazar from, among other things, communicating--"in any manner
whatsoever except through attorneys"--with any protected parties named in the order, including
Yolanda and her daughter, Rudi Barrera. (1) Shortly thereafter, Salazar was charged with violating the
protective order by mailing a letter from jail to Yolanda's home. The handwritten letter is addressed
to "Yolanda" and contains a suggestion of secret communication: "As you well know [I] would like
to talk to you [a]bout this matter. Please let's talk, on the cool no one has to know, let me know. 
Can send a message through O.B.'s mail no one checks that." Salazar's June 9, 2009 charging instrument in the clerk's record alleges:


Robert Salazar II, the Defendant, on or about May 9, 2009, did then and there
intentionally, knowingly, and recklessly violate an order of County Court at Law
Four, Travis County, Texas, Protective Order #C1CV09003018, dated April 3, 2009,
by intentionally and knowingly communicating with Rudi Barrera, a protected
person, in a manner other than through the Defendant's attorney, to wit: the
Defendant sent a letter to Rudi Barrera, as specifically prohibited by said order, and
the Defendant knew that said Protective Order was in effect, AGAINST THE
PEACE AND DIGNITY OF THE STATE.



(Italics added, capitalization in original.)

 After Yolanda testified that she received the letter one month after the entry of
the protective order, that the envelope containing the letter was addressed to her residence in
Travis County, that Salazar's name and location of incarceration in Del Valle were listed as the
return address, that she recognized the letter's handwriting as Salazar's, and that Salazar knew about
the specific incidents referenced in the letter, the State rested its case.

 Before the defense began its presentation of evidence and outside the presence of
the jury, the trial court called a bench conference to discuss a potential variance that it identified
between the charging instrument on file and the trial evidence. The court observed that the charging
instrument on file alleged that Salazar violated the protective order by sending a letter to "Rudi,"
but the jury heard evidence that a letter was sent to "Yolanda." The State then produced: (1) a
file-stamped copy of its motion to amend the charging instrument in this cause to allege Yolanda as
the victim; (2) a file-stamped copy of the trial court's signed order granting the State's motion to
amend; (2) and (3) a confirmation sheet showing that the prosecutor sent the proposed amendment to
Salazar's counsel by facsimile transmission on August 3, 2010, more than two months before trial.
Given that evidence--and the lack of any defense objection when the charging instrument was read
with Yolanda's name during formal arraignment on the day of trial--the court ruled that Salazar's
counsel had been properly served with the amendment.

 Following that ruling, Salazar made a motion for directed verdict contending that
"[t]he evidence d[id] not support the pleadings." The trial court denied the motion. Trial proceeded,
the jury found Salazar guilty of the misdemeanor offense of violation of a protective order, see
Tex. Penal Code Ann. § 25.07(a)(2)(c), (g) (West Supp. 2010), and the trial court sentenced Salazar
to 180 days in jail pursuant to his plea bargain on punishment.


ANALYSIS


Preservation of error

 Salazar contends that the trial court erred in denying his motion for instructed verdict (3)
when a fatal variance existed between the charging instrument and the State's trial evidence.
Specifically, Salazar asserts that the information charges him with violating a protective order by
sending a letter to "Rudi Barrera," a protected person listed in the order, but the evidence at trial
showed that Salazar sent a letter to "Yolanda Barrera," Rudi's mother.

 The State contends that the charging instrument was successfully amended, with
notice to Salazar, such that no variance existed at trial. But as a preliminary matter, the State argues
that Salazar's point of error is not preserved for our review because he never objected to the State's
amended charging instrument, never claimed surprise or requested a continuance to prepare, and
never specified the elements lacking from the State's proof in his motion for directed verdict. See
Tex. R. App. P. 33.1(a).

 During the bench conference after the close of the State's evidence, the trial court
stated:

THE COURT: [T]he defendant has been charged with two counts of violation of
protective order, sending letters to two different people and I'm
going to use the first names, Yolanda and Rudi. In the file before
the Court today, there is an information that seems to say Rudi,
while it's obvious from the evidence we're trying the case about a
letter to Yolanda, and so I've asked the lawyers do we have a
problem and I've been told the case was amended and in fact
there's an amendment that shows that the information is for
Yolanda, and in fact under this cause number we're proceeding for
an offense alleged to have been committed against Yolanda, but
there wasn't an amendment in the file. So anyways, the lawyers
have been given a chance to sort that out for the Court, and so
somebody help me out here.



The court was then informed that the State filed two protective order violations against Salazar, one
pertaining to Yolanda and another pertaining to Rudi, both of whom were "protected persons" under
the agreed order. The charging instrument in the clerk's record in this case charged Salazar with
violating a protective order by mailing a letter to Rudi. However, the State presented the court with
a file-stamped copy of its August 6 motion to amend the charging instrument to allege Yolanda as
the victim, a file-stamped copy of the trial court's August 6 signed order granting that motion to
amend--which the court acknowledged that it signed--and an August 3 confirmation sheet showing
the prosecutor's successful fax delivery of the proposed amendment to Salazar's counsel, all of
which occurred more than two months before trial.

 When the trial court asked specifically about whether defense counsel had notice
of the amendment, Salazar's counsel offered nothing and did not deny receipt of the State's
motion to amend:

 

THE COURT: Mr. Blackburn, is your number [phone number]?


[Defense counsel]: I believe so.


THE COURT: So I have at least evidence in front of me that would indicate
that you were faxed this back in August so that's quite
sometime ago, at least a proposed amendment if they sent to
you on August 3.


 . . . .


THE COURT: Do you dispute that they sent you that motion that their fax
seems to indicate that they did?


[Defense counsel]: I have no evidence to present to the Court that they did not
send that fax.


THE COURT: So they could have and you don't remember? Or Adam could
have got it? Mr. Reposa is not present I know right now, or
obviously a staff member in your office may have picked it up
and given it to either one of you et cetera, we don't know is
what you're telling me? Are you telling me you've never
seen the amendment or just don't know?


[Defense counsel]: Your Honor, I went and visited with [prosecutor] Natalie
Fowler in her office after a prior--before a prior trial setting
and I remember going through all of the files, including all the
exhibits that have been offered prior to this discussion. (4) And
my notes do not indicate, I don't have anything to tell you that
they did not give me this notice.



(Emphasis added.) When all parties responded that they had nothing further for the court to consider
on the variance issue, the trial court issued its ruling:


THE COURT: I do have that facsimile that seems to indicate that it in fact
was faxed through to defense counsel's office many weeks
before this setting. When you read the charge this morning,
State, did you read complainant Yolanda?


[Prosecutor]: I did, Your Honor.


THE COURT: And there weren't any objections or statements from defense
either I guess I should add that to the record as well,
obviously the record reflects that. I'm going to proceed
because it appears the State in fact served defense counsel
with this amendment, it was then signed apparently shortly
thereafter and file stamped at the clerk's office. The fact that
it's not in the clerk's file concerns me a great deal, but the
fact that it is in fact stamped by the clerk's office, it clearly
says Dana DeBeauvoir's office filed stamped means it was
in the clerk's office where it was file[] stamp[ed] not in the
courtroom or someplace else. . . . I will just say for the
record it appears to me that there's a proper completed
facsimile from the [S]tate to defense counsel showing the
amendment some many weeks before this hearing, and so
I'm going to accept that as proper service.



 Salazar then proceeded to make his motion for directed verdict, and the court asked
counsel to provide some clarification:


THE COURT: Is there anything we need to do out of the presence of the jury
at this time? Either side?


[Defense counsel]: I would ask for a ruling on a Motion for Directed Verdict.


THE COURT: Okay, what is it the State has failed to prove, what element?

[Defense counsel]: The evidence does not support the pleadings.

THE COURT: That's kind of vague, you want to point me to a specific
element they failed to prove? I don't have my notes in front
of me because I've handed my file to you, but as I wrote
through in my mind the dates that were given, the location
w[as] given, without saying whether I believe it or not, the
complainant has testified that she received a letter that she
recognized as his handwriting as well as there being some
details in it made her believe that it was from your client, and
a protective order has been issued saying, well one the
protective order is in evidence, and I believe they had
testimony as to service of the defendant also. If I'm wrong
tell me, but I'm trying to click off the elements since you've
given me such a vague motion, but I can't think of an element
that they don't have some evidence. Without saying whether
I believe it or not, or does it rise to the level to convince a jury
beyond a reasonable doubt I'm not saying, but I think they've
introduced evidence that a jury could use to find each and
every one of those elements. If I'm wrong, correct me, if not
I will deny your motion. Anything else on the record?


[Defense counsel]: That's all, Your Honor.



 Based on this exchange, the State argues that Salazar failed to preserve error because
his motion for directed verdict was insufficiently specific to make the trial court aware of the
deficient element or elements of the State's proof. While Salazar's response to the court's inquiry
about the basis for the directed verdict could have been clearer, we conclude that the specific grounds
for the directed verdict were apparent from the context because of the timing of the motion,
which was made immediately after defense counsel's fatal-variance argument. See Tex. R. App.
P. 33.1(a)(1)(A). We will therefore address the merits of Salazar's point of error.


Denial of directed verdict for fatal variance

 Salazar challenges the denial of his motion for directed verdict, arguing that a fatal
variance existed between the charging instrument and the evidence at trial. A "variance" occurs
whenever there is a discrepancy between the allegations in the charging instrument and the proof
offered at trial. Byrd v. State, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing Gollihar v. State,
46 S.W.3d 243, 246 (Tex. Crim. App. 2001)). A variance is considered an evidentiary sufficiency
issue. Gollihar, 46 S.W.3d at 247. In most variance situations, the State has successfully proven
the defendant guilty of a crime, but it has proven the commission of the crime in a manner
that varies from the allegations in the charging instrument. Id. at 246. Thus, the variance usually
presents only a notice problem. Fuller v. State, 73 S.W.3d 250, 253 n.2 (Tex. Crim. App. 2002)
(internal citations omitted).

 A challenge to the trial court's denial of a directed verdict is "in actuality a challenge
to the sufficiency of the evidence to support the conviction." Cook v. State, 858 S.W.2d 467, 470
(Tex. Crim. App. 1993) (quoting Madden v. State, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990)).
In reviewing the sufficiency of the evidence, we consider all the evidence in the light most favorable
to the verdict to determine whether any rational trier of fact could have found the essential elements
of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); Bigon
v. State, 252 S.W.3d 360, 366 (Tex. Crim. App. 2008). If the evidence is sufficient to sustain the
conviction, then the trial court judge did not err in overruling the defendant's motion for directed
verdict. Madden, 799 S.W.2d at 686.

 A variance between the wording of a charging instrument and the trial evidence
is fatal only if the variance is material and prejudices the defendant's substantial rights. Gollihar,
46 S.W.3d at 257 (quoting United States v. Sprick, 233 F.3d 845, 853 (5th Cir. 2000)). The test for
materiality involves a two-pronged inquiry into whether a defendant's substantial rights have
been prejudiced. Santana v. State, 59 S.W.3d 187, 195 (Tex. Crim. App. 2001). We must determine
(1) whether the charging instrument, as written, informed the defendant of the charge against
him sufficiently to allow him to prepare an adequate defense at trial and (2) whether prosecution
under the deficiently drafted charging instrument would subject the defendant to the risk of
being prosecuted later for the same crime. Id. (quoting Gollihar, 46 S.W.3d at 257). "The object
of the doctrine of variance between allegations of an indictment [or other charging instrument] is to
avoid surprise, and for such variance to be material it must be such as to mislead the party to his
prejudice." Cole v. State, 611 S.W.2d 79, 82 (Tex. Crim. App. 1981) (internal citations omitted).
It is well established that the burden of demonstrating surprise or prejudice based on a variance
between a charging instrument and the proof at trial is borne by the defendant. Santana, 59 S.W.3d
at 194. Only a material variance between the charging instrument and the proof at trial will render
the evidence insufficient. Gollihar, 46 S.W.3d at 257.

 Whether a variance existed at all depends on whether the original charging instrument
naming Rudi was properly amended to name Yolanda. The Texas Court of Criminal Appeals
recognizes that physical alteration of the charging instrument is not the exclusive method of
accomplishing an amendment. Riney v. State, 28 S.W.3d 561, 565 (Tex. Crim. App. 2000). Instead,
it is acceptable for the State to proffer its amended version of the original charging instrument for
the trial court's approval, and if approved, the amended version need only be incorporated into
the record under the court's direction, pursuant to article 28.11, with the defense's affirmative
assent and knowledge. Id. at 565-66; see Tex. Code Crim. Proc. Ann. arts. 28.10 (permitting
amendment of charging instrument before trial with notice to defendant and after trial commences
if defendant does not object), .11 ("All amendments of an indictment or information shall be made
with the leave of the court and under its direction.") (West 2006). In Riney, the State produced a
photocopy of the original indictment, interlineated and incorporated into the court clerk's file, all
with the defendant's knowledge and approval. Id. at 566. Although the court of criminal appeals
cautioned that neither the motion to amend the charging instrument nor the trial court's granting of
the motion alone could constitute an amendment, extra steps taken to comply with the code of
criminal procedure promoted the functions of keeping the defendant abreast of the charges against
him and giving him adequate knowledge to prepare an appropriate defense. Id.

 This record reflects that: (1) the State amended the charging instrument before trial to
name Yolanda as the victim; (2) the trial court found that the proposed amendment had been served
on the defense "many weeks" before trial; (3) the trial court acknowledged that "in fact there's an
amendment that shows that the information is for Yolanda, and in fact under this cause number we're
proceeding for an offense alleged to have been committed against Yolanda"; (4) the State read the
amended, previously served charging instrument to the jury during Salazar's formal arraignment,
incorporating it into the record; and (5) the defense did not object when the amended charging
instrument was read. Cf. Serna v. State, 69 S.W.3d 377, 380 (Tex. App.--El Paso 2002, no pet.)
(holding that indictment was not amended where defendant objected to amended indictment and
amended indictment was not filed nor was it read into the record). Under the circumstances
presented by this record, we conclude that the amendment of the charging instrument met the
requirements of articles 28.10 and 28.11 of the code of criminal procedure. See Tex. Code Crim.
Proc. Ann. arts. 28.10, .11; Riney, 28 S.W.3d at 565-66.


No proof of surprise or prejudice

 Even if we were to assume that the charging instrument's amendment was ineffective,
a variance between the allegations and the proof will not render the evidence insufficient if
the defendant was not surprised or prejudiced by the variance. Valenti v. State, 49 S.W.3d 594, 598
(Tex. App.--Fort Worth 2001, no pet.).

 Salazar never states affirmatively that he was surprised by the amendment of the
charging instrument, instead he carefully suggests to this Court that "there remains the legitimate
question of whether he was surprised by the amendment at the time of trial." The State contends
that Salazar was not surprised by the amendment, and that he fully expected to defend against
the amended allegations naming Yolanda in the charging instrument because: (1) defense counsel
reviewed documents in the prosecutor's office before trial, which would have included the amended
charging instrument; (2) Salazar did not object when the amended charging instrument naming
Yolanda was read at trial; and (3) Salazar did not object to Yolanda's trial testimony.

 Salazar's suggestion of surprise stands in contrast to this record, which includes the
affidavit for Salazar's warrant of arrest and detention, filed May 27, 2009, showing that Salazar had
notice that the victim's name in the underlying cause was Yolanda Barrera:


Robert Salazar violated the protective order when . . . : Yolanda Barrera reported
that on 05/02/09, she received a handwritten letter, addressed to her, from
Robert Salazar. Yolanda Barrera recognized the handwriting and signature in the
letter, as that of Robert Salazar.


(Emphasis added.) Additionally, Salazar offers no evidence to dispute that the State sent a copy of
its motion to amend by facsimile transmission to Salazar's counsel and that Salazar's counsel
received that facsimile transmission more than two months before trial. (5) After receiving the fax,
Salazar did not object to the proposed amendment of the charging instrument, he did not object
during his formal arraignment when the charging instrument was read identifying his victim as
"Yolanda Barrera," and he informed the court that he had no objections or changes to the jury charge
naming "Yolanda Barrera" as the victim of his offense. 

 Based on this record, Salazar has not met his burden of showing that the variance
affected his ability to prepare an adequate defense at trial or that prosecution under the original
charging instrument would subject him to the risk of being prosecuted later for the same crime that
was tried. As the court of criminal appeals has observed, if an appellant were prosecuted again, he
could avail himself of not merely the charging instrument but the entire record. Santana, 59 S.W.3d
at 195 (citing Gollihar, 46 S.W.3d at 258). The record here indicates that the pretrial arrest warrant
affidavit, the charging instrument that was read to the jury, the trial evidence, and the jury charge
identified Yolanda as the victim of Salazar's violation of the agreed protective order. With this
record, Salazar is in no danger of being prosecuted again for the same violation of the agreed
protective order that was proved at trial. See Gollihar, 46 S.W.3d at 258.

 Because Salazar has not shown surprise or prejudice based on the discrepancy
between the original charging instrument and the proof at trial, he has not demonstrated a material
variance that would render the evidence insufficient and entitle him to a directed verdict. See
Santana, 59 S.W.3d at 195; Gollihar, 46 S.W.3d at 258; Valenti, 49 S.W.3d at 598. This record,
including the letter that Salazar wrote to Yolanda and sent from jail to her home during the time that
the agreed protected order was in effect, shows that the trial evidence was sufficient to sustain
Salazar's conviction. Accordingly, we conclude that the trial court did not err in denying Salazar's
motion for directed verdict. See Madden, 799 S.W.2d at 686. Salazar's sole point of error is
overruled.


CONCLUSION


 Having overruled Salazar's sole point of error, we affirm the trial court's judgment
of conviction.



 

 Jeff Rose, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed: September 28, 2011

Do Not Publish
1. For clarity, we will refer to Yolanda Barrera and Rudi Barrera by their first names.
2. There is no explanation why the motion and order are omitted from the clerk's record. 
They are attached as an exhibit to the reporter's record.
3. Salazar's issue on appeal refers to a motion for "instructed" verdict, but the record
shows that he sought a "directed" verdict. "Directed verdict" and "instructed verdict" are used
interchangeably. Black's Law Dictionary 1696, 1697 (9th ed. 2009). For accuracy, we will refer to
the directed verdict motion that Salazar sought at trial.
4. A file-stamped copy of the State's "Motion to Amend Information" and a signed, file-stamped copy of the "Order of Amendment," both attached to the reporter's record as Court's
Exhibit No. 2, were offered and admitted during the bench conference.
5. Defense counsel's remarks during voir dire also suggest that Salazar had notice that trial
was for the protective order violation involving Yolanda. The record shows that defense counsel
alluded to the proof that an "applicant" must make for the issuance of a protective order and offered
an example of what a girlfriend could say in an affidavit in support of her application--"maybe
even in this very court"--for a protective order against her "boyfriend." There were several
protected persons in the agreed protective order against Salazar but only one applicant--his
girlfriend, Yolanda Barrera.