**Opinion issued October 15, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00355-CR

———————————

**CALYNN MICHELLE REFUGE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 208th District Court**
**Harris County, Texas**
**Trial Court Case No. 1519885**

## MEMORANDUM OPINION

A jury convicted appellant, Calynn Michelle Refuge, of the third-degree felony offense of theft of property valued equal to or greater than $30,000 but less than $150,000. *See* TEX. PENAL CODE § 31.03(a), (e)(5). The trial court assessed punishment at 10 years' imprisonment, but suspended the imposition of the sentence,

placed Refuge on community supervision for 10 years, and ordered her to pay $30,000 in restitution as a condition of community supervision. On appeal, Refuge challenges the trial court's denial of her motion for directed verdict and contends that the evidence is legally insufficient to support her theft conviction. We affirm.

## Background

This case involves $30,000 missing from a bank vault. Refuge's amended indictment charged her with theft of cash "of the value of at least thirty thousand dollars and less than one hundred fifty thousand dollars." The amended indictment listed B. Connelly, a senior internal investigator for Wells Fargo, as the owner of the stolen money. Refuge pleaded not guilty to the theft charge.

In 2015, Wells Fargo Bank hired Refuge as a lead teller at its branch in La Porte, Texas. Refuge's duties included withdrawing and receiving deposits, ordering cash for the branch, and balancing the cash vault as well as her own cash drawer at the teller station. She was also required to comply with Wells Fargo's security policies and procedures to prevent employee theft. J. Havens, the branch manager at the La Porte branch, testified in detail about the bank's security policies and procedures.

A teller performs a "buy/sell" transaction—a cash transfer from the vault to a teller—when he or she needs to replenish the cash drawer. The vault is monitored by video, and a dual control combination protects the vault by requiring two tellers

2

to enter one half of their personal code to access it.[1] After accessing the vault and removing straps of cash from the vault sleeve, both tellers verify the amount using a currency counter. The tellers then record the amount bought in a cash movement log in the vault, sign the cash movement log, and enter the buy/sell transaction in the electronic teller system. Wells Fargo Bank implemented and enforced this dual control system to mitigate the "loss exposure." At the end of the day, two tellers "balance the vault" to ensure that the amount sold from the vault accurately matches the amount bought by the tellers.

On December 11, 2015, the end-of-the-day balance sheet showed that the bank vault was balanced. The next day, however, Havens discovered that $30,000 was missing from the bank vault. Havens reported the missing cash to her district manager, and they both contacted Connelly to investigate the missing money. Connelly testified about his investigation at trial. He audited the cash in the branch and the cash movement logs. During the audit, the vault was found to be short exactly $30,000 in $100 denominations. He also reviewed and analyzed the surveillance footage. Connelly concluded that Refuge violated the bank's policies because the video footage revealed her taking money "directly from the vault" and placing it "directly into her assigned teller sleeve" without counting or verifying it. The

---

[1]    No employees knew both combinations.

3

footage also showed Refuge entering the vault, opening her teller sleeve, placing the $30,000 in "between [her] jacket and her body," and leaving the area.

Connelly testified that six employees entered the vault that day. He interviewed five of the employees. When he tried to interview Refuge, she "refused to cooperate" in the investigation and "retained legal counsel." At trial, Refuge testified in her own defense and denied taking the money.

Outside the presence of the jury, Refuge moved for directed verdict, arguing that the State failed to prove that Connelly had a greater right to the money than Refuge. The trial court denied the motion. After the close of evidence, the jury convicted Refuge of theft of property with a value of $30,000 or more but less than $150,000. The trial court assessed punishment at 10 years' imprisonment, but suspended the imposition of sentence, placed her on 10 years' community supervision, and ordered that she make restitution in the amount of $30,000. Refuge appealed.

## Sufficiency of Ownership Evidence

Refuge challenges the trial court's denial of her motion for directed verdict. She contends that the evidence is legally insufficient to support her conviction because the State failed to prove that Connelly was the actual owner or special owner of the $30,000, as alleged in the amended indictment. A challenge to a trial court's ruling on a motion for directed verdict is a challenge to the sufficiency of the

4

evidence to support the conviction. *See Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990) (en banc); *Barnes v. State*, 248 S.W.3d 217, 219 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

## A. Standard of review

We review Refuge's challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Cary v. State*, 507 S.W.3d 761, 765 (Tex. Crim. App. 2016). Under that standard, we examine all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19; *Acosta v. State*, 429 S.W.3d 621, 624–25 (Tex. Crim. App. 2014). The jury is the sole judge of the credibility of witnesses and the weight to give testimony. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). "The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all the evidence or testimony proffered, and weigh the evidence as it sees fit." *Galvan-Cerna v. State*, 509 S.W.3d 398, 403 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

We resolve inconsistencies in the evidence in favor of the verdict. *See Bohannan v. State*, 546 S.W.3d 166, 178 (Tex. Crim. App. 2017). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*,

5

214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The standard of review is the same for both direct and circumstantial evidence cases. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

**B.      Applicable law**

Theft occurs when a person unlawfully appropriates property with the intent to deprive the owner of it. TEX. PENAL CODE § 31.03(a). The term "owner" means "a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor." *Id*. § 1.07(a)(35)(A). While the name of the owner is not a substantive element of the offense, the State is "required to prove, beyond a reasonable doubt, that the person (or entity) alleged in the indictment as the owner is the same *person* (or entity)— regardless of the name—as shown by the evidence." *Byrd v. State*, 336 S.W.3d 242, 252 (Tex. Crim. App. 2011). "[O]wnership may be alleged as either the actual or a special owner . . . ." *Garza v. State*, 344 S.W.3d 409, 412 (Tex. Crim. App. 2011). "A 'special owner' is an individual who is in custody or control of property belonging to another person." *Id*. at 412–13 (quoting *Harrell v. State*, 852 S.W.2d 521, 523 (Tex. Crim. App. 1993) (en banc)).

**C.      Analysis**

Relying on *Freeman*, Refuge argues that the State failed to prove that Connelly had a "greater right to possession" because he and Refuge were both Wells

Fargo employees holding equal possessory interests in the money at the time of the theft. *See Freeman v. State*, 707 S.W.2d 597 (Tex. Crim. App. 1986) (en banc). In response, the State argues that Refuge forfeited her possessory interest when she breached her fiduciary duty by committing theft.

In *Freeman*, the defendant worked as a cashier along with a co-defendant, Stroud. *Id*. at 600. Stroud came in to work to pick up her paycheck while the defendant worked as a cashier. *Id*. at 601. Stroud paid the defendant for several items, and the defendant placed other unpaid items into Stroud's bag. *Id*. The charging instrument named a security guard who worked at the store and viewed the theft as the owner. *Id*.

At trial, the security guard testified that she did not have a greater right of possession to the items stolen by the defendant and Stroud, but did have "a greater right of possession than someone who had not paid for something who is walking out of the store." *Id*. A jury convicted the defendant of theft. *Id*. at 600. On appeal, the defendant challenged her conviction, arguing that the State failed to prove an element of theft because she and the security guard each had equal possessory interests in the merchandise that she was accused of stealing. *Id*. at 602. In holding that the security guard held a superior interest in the merchandise, the court determined that the evidence established that the security guard had a possessory interest in the merchandise because of her position as a security guard before the

7

theft had occurred. *Id*. at 605. The defendant maintained an equal possessory interest in the merchandise but forfeited such possessory interest when she turned the unpaid merchandise over to Stroud. *Id*. These actions, the court explained, showed that the defendant exerted "unauthorized control over the property," demonstrating her "desire to permanently deprive . . . the lawful owner of the property." *Id*.

The rationale in *Freeman* is persuasive here. At trial, Connelly testified about how he reviewed the surveillance footage during the investigation. Connelly also showed the jury, based on his observations of the footage, how Refuge took the money from the vault, tucked it next to the side of her body, and concealed it with the arm of her jacket before leaving the bank without authorization. The moment Refuge took the money without the bank's consent, she relinquished "whatever possessory interest" she might have had in the money by "exerting unauthorized control over" it. *See Freeman*, 707 S.W.2d at 606. The jury could have reasonably found that Connelly, as Wells Fargo's senior internal investigator, had a greater right to possess the money than Refuge.

In the alternative, Refuge also argues that the *Byrd* decision is controlling and mandates reversal because the State improperly named Connelly, and not Wells Fargo, as the owner in the indictment and presented no evidence showing that. *See Byrd*, 336 S.W.3d at 244. In response, the State contends that *Byrd* is inapposite

8

because there was overwhelming evidence showing that Connelly was the special owner.

In *Byrd*, the defendant was arrested and charged with misdemeanor theft for allegedly shoplifting items from Wal-Mart. *Id*. The information read: "Lavonne Byrd, hereinafter referred to as defendant, with intent to deprive the owner, Mike Morales, of property namely, three (3) pairs of pants and one (1) DVD, did unlawfully, without the effective consent of the owner, appropriate said property." *Id*. A loss-prevention officer for Walmart testified at trial about witnessing the defendant's attempt to steal these items, and further testified that "Wal-Mart hadn't given her consent to take that property." *Id*. at 244–45. The jury charge tracked the information, including the allegation that the owner of the property was "Mike Morales," even though the State introduced no evidence connecting "Mike Morales" to Wal-Mart. *Id*. at 245. Despite this discrepancy, the jury convicted the defendant of theft. *Id*.

The court of appeals affirmed the conviction, holding that the evidence was legally sufficient to support the conviction because proof of the name of the owner of the property is "not required to be included in a hypothetically correct jury charge" because the owner's name is "not a substantive or statutory element of theft." *Id*. The court therefore rejected the defendant's position requiring the State to prove that

"Mike Morales" was the owner of the property or that he was somehow connected to Wal-Mart. *Id.*

In finding that the evidence was insufficient to support the defendant's conviction, the Court of Criminal Appeals noted that there was no evidence about who "Mike Morales" was, much less evidence that he had a greater right than the defendant to possess the stolen property:

> At no time during the trial did anyone ever refer to a "Mike Morales." And no witness ever made any connection between a "Mike Morales" and Wal–Mart or any of the property that appellant shoplifted. No one—not the prosecutor, the defense counsel, the trial judge, or even the jury—seemed to notice this astonishing discrepancy between the allegation of "Mike Morales" as the owner of the property in both the information and the jury charge and the absence of any mention of him or his possible connection to the property at trial.

*Id.* Based on the insufficient evidence of the owner, the *Byrd* court reversed the defendant's conviction because "the State failed to prove appellant stole any property from Mike Morales, whom it had alleged as the owner of the shoplifted items." *Id*. at 257. "Because the State failed to prove that 'Mike Morales' had any ownership interest in the property that [the defendant] stole, the evidence [was] insufficient" and the defendant was entitled to an acquittal. *Id*. at 258.

Here, there is sufficient evidence to support the jury's finding that Connelly was the special owner of the stolen funds because the evidence connects Connelly to Wells Fargo's property as the bank's senior internal investigator. Unlike *Byrd*— a case in which the named "owner" of stolen merchandise was never even mentioned

10

at trial to connect him to his employer that was the actual victim of the theft—Connelly was a testifying complainant who was connected to the missing money based on the evidence presented at trial. Connelly testified that he had worked for Wells Fargo for 17 years. Connelly described his duties as a senior internal investigator for Wells Fargo:

> We are assigned [to] review crimes that employees commit. Either crimes against the bank where employee theft or crimes where employees might have stolen money from customers. So, we handle fraud, crimes committed, and also egregious policy violations. I might be called in to talk to employees and branches about that.

He testified extensively about the specific internal investigation into Refuge's alleged theft. Connelly explained that he audited the La Porte branch before turning over his information identifying Refuge as the suspect to law enforcement. He provided significant testimony about his investigation of the stolen money. Connelly testified about how he determined that the missing money came from the vault. He also testified about his observations from the surveillance footage showing Refuge violating bank policies by not using dual control procedures.

Similarly, other witnesses testified to Connelly's role with the bank and involvement in the investigation. For example, Havens testified that she contacted Connelly to investigate the theft when she discovered the money was missing. Detective K. Green, an officer with the City of La Porte Police Department, also testified that Connelly contacted him after Connelly had concluded the investigation

11

and relayed the details of his internal investigation. Detective Green independently investigated the theft case and later filed charges against Refuge.

The jury may draw reasonable inferences from "basic facts to ultimate facts" about the owner in this case. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Ownership status may be imputed to "anyone with a rational connection to the property." *Garza*, 344 S.W.3d at 413. Because "possession" is defined as actual care, custody, control, or management, *see* TEX. PENAL CODE § 1.07(a)(39), any agent of a company may properly be designated as the "owner" in the indictment as long as the evidence connects him or her to the property. *See id.* at 414 (approving the use of a Hewlett Packard employee as the complainant and special owner of the corporation's money).

Because we conclude that there was sufficient evidence for the jury to rationally conclude that Connelly was the "owner" of the stolen funds, we overrule Refuge's issues. *See Binnion v. State*, 527 S.W.3d 536, 543–44 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (holding employee's testimony that employee had greater right to funds than defendant was sufficient evidence that employee was owner); *McCurdy v. State*, 550 S.W.3d 331, 338 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (determining that the evidence was legally sufficient to show that employee for parent company of a chain store was a special owner as alleged in the

indictment); *Sandone v. State*, 394 S.W.3d 788, 792–93 (Tex. App.—Fort Worth 2013, no pet.) (holding loss-prevention officer qualified as owner of stolen property).

## Conclusion

We affirm the trial court's judgment.


Sarah Beth Landau
Justice

Panel consists of Justices Landau, Lloyd, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).

13